## The Saratoga.[1]

### Cooper v. The Saratoga.

*(District Court, S. D. New York.* December 15, 1888

1. COLLISION—BETWEEN STEAM AND SAIL—NIGHT—NARROW CHANNEL—HIGH SPEED—NEGLIGENT LOOKOUT.
   The steamer S., going down the Hudson river at the rate of 14 knots, on a night which was not intensely dark, and in a place where the channel was not over 700 or 800 feet wide, ran into a schooner beating down river. *Held,* that the S. was in fault for the collision for not seeing the schooner at least 500 feet away, and in time to avoid her, had the lookout been vigilant.
2. SAME—SAILING VESSEL—APPROACH OF STEAMER—FLASH-LIGHTS.
   The schooner beating down, and having seen the steamer a mile distant, rapidly overtaking her, and knowing that her own colored lights were not visible to the steamer, till a few moments before collision, *held* also in fault for not exhibiting to the steamer a flash-light, or any other signal of her presence.
3. SAME—REV. ST. U. S. § 4234.
   Section 4234, Rev. St. U. S., applies to all sailing vessels.

In Admiralty.

Libel by the owner of the schooner L. Holbrook for damages caused by collision with the steam-ship Saratoga.

*Wing, Shoudy & Putnam,* for libelant.

*Hyland & Zabriskie,* for claimant.

BROWN, J. On the night of August 15, 1888, as the libelant's schooner L. Holbrook, loaded with a cargo of brick, was beating down the Hudson river in a light wind, the tide being ebb, she was run into by the passenger steam-boat Saratoga, on her way from Troy to New York. The place of collision was about in mid-channel, nearly opposite Catskill Point, where the available channel-way was only some 700 or 800 feet wide. The wind, as admitted in the pleadings, was about S. S. E., and the schooner was on her starboard tack. She must have been heading, therefore, nearly directly across the river, or possibly one point down river; not enough to shut out her red light completely when on her course. She was struck on the port side, near the main rigging, and sank almost immediately under the stem of the Saratoga.

The claimants contend that the night was so dark that it was impossible for the pilot of the steamer to see the Holbrook, until they were close upon her,—within 50 feet, as her witnesses allege. The steamer was going at the rate of about fourteen knots through the water; the schooner about one and one-half. The lights of the steamer were seen on board the schooner when she was over a mile distant. No flash-light was exhibited from the schooner. On the schooner's previous tack—her port tack—her head was undoubtedly pointed so much down river that her green light was not visible to the steamer behind; and the steamer, being then upon a bend in the river, showed her red light only. The

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

schooner was on the port tack probably about five minutes. She began to come about from her port to her starboard tack probably three or four minutes before the collision; but as the wind was light, she would be slow in coming around and filling away. When she got filled away on the starboard tack, her red light would not, probably, have come into view to the steamer more than a minute or a half minute before the collision. When she last tacked the two colored lights of the steamer were visible, estimated about a half mile distant. The claimants contend that a good lookout was kept on the steamer, and that no lights at all on the schooner were seen, or were at any time visible. This would be so, if the schooner on her starboard tack headed two points down river. But upon the admitted direction of the wind, it is not probable she headed down so much.

The libelants contend that the night was not dark; that the collision was about 15 minutes before the setting of the moon; that though the sky was somewhat obscured, the stars were visible overhead; and that the hulls and sails of vessels could be seen without a light at least half a mile distant. Some witnesses say that the moon was still visible. Numerous witnesses sustain each side on this point.

1. I am not satisfied that the night was as dark as contended for by the claimants. There is no doubt that the time of collision is accurately fixed at very near 11:35 P. M. This was at least 20 minutes before the moon had set. Whether the moon had at the time sunk behind the western hills or not, its light would not be wholly lost. There was no fog; the clouds were not thick, and were at least broken in places. The large passenger steamer Dean Richmond passed by at 1 A. M. Her pilot and wheelsman saw the schooner's mast and sails projecting above water when about 500 feet distant. She lay a little to the eastward of the Richmond's usual course. The latter, however, veered about a half point to the westward and passed the wreck about 150 feet off. Naturally it would have been darker then than at the time of collision before the moon had set. Whether, therefore, the schooner's red light was exposed to view or not, it is more probable that the schooner, or her light, if visible, was not seen through some momentary inattention of the lookout during the minute or half minute before collision, than that the darkness was so dense that she could not be seen at all until within 50 feet of her, as the claimants allege. In a half minute the Saratoga traveled about 700 feet. If the night was as dark as the claimants allege, the high speed of the Saratoga in so narrow a channel, and where other vessels were to be expected, was unjustifiable. *The Batavier*, 9 Moore, P. C. 286; *The Colorado*, 91 U. S. 692, 703. I think, however, the schooner could have been seen at least 500 feet distant, and probably much further off than that. Had she been seen at that distance, as the Richmond saw her, there was ample time to change a point to the westward; and half that change would have avoided the schooner. In so narrow a channel-way, where vessels were likely to be beating down, with the steamer going at such speed, and when the lights of sail vessels beating downward would be mostly, if not wholly, obscured, the vigilance of the lookout

ought to be proportionate to the danger; much stricter, therefore, than in the open sea where vessels are few; as in *The Algiers*, 21 Fed. Rep. 343. I cannot believe that if this schooner had been seen even 300 feet away, as she ought to have been, the steamer would not have been able easily to go astern of her by porting her helm. The libelant, indeed, contends that the schooner was seen, and that the steamer's helm was starboarded, and that she attempted to cross ahead of the schooner. But this rests chiefly on the steamer's head swinging to the eastward after the collision, and the appearance of the red light just before collision. The near approach of the steamer, however, would cause the latter change in lights to an observer on the after-part of the steamer. But as the officers in charge deny any change of helm, I accept their account of the matter in that respect, though not without some doubt, as the steamer had just before been under a starboard helm in coming around the long bend.

2. The libelant's schooner I must hold to have been equally to blame for showing no signal to the approaching steamer. Her lights were seen some time before; first her red light a mile off, afterwards both colored lights, making directly for the schooner, when nearly a half mile distant. She must have known that her own colored lights on her previous tack and on coming about were not visible. There was special need, therefore, of some signal to apprise the steamer of the schooner's presence. In the case of *The Excelsior*, 12 Fed. Rep. 203, the failure to exhibit a flash-light in the North river, under section 4234, Rev. St., was held to be a fault contributing to the collision. The libelant contends that that section applies only to sailing vessels of which the collector or general officers of the customs have jurisdiction. The language of the section says "all sailing vessels." The purposes of the act are certainly applicable alike to all vessels engaged in trade and commerce. It would result in great confusion and misunderstanding if the exhibition of a flash-light were obligatory on some vessels, and not on others. I think all alike are intended.

Aside from the statute, the circumstances in this case were such that the exhibition of a signal-light by the schooner was an obligation of reasonable prudence. The presence and the approach of the steamer and her great speed, as one of the usual passenger steamers, were known; the channel-way was narrow; and the fact that the schooner's colored lights, for several minutes previous, had not been visible, and certainly up to within two minutes of collision were not visible, when it was clearly time that the steamer ought to be apprised of the schooner's presence ahead, made it obligatory on the schooner to show some signal. The signal lantern was at hand and could have been used easily. The situation was, therefore, one of manifest danger, before the schooner's red light could have come into view. The obligation of vessels whose colored lights are obscured to make known their presence seasonably, to another vessel behind in circumstances of danger, has been frequently adjudged. *The Oder*, 13 Fed. Rep. 272; *The State of Alabama*, 17 Fed. Rep. 855, 856; *The Erastus Corning*, 25 Fed. Rep. 574; *The Anglo-Indian*,

3 Asp. 1, 4, 33 Law T. (N. S.) 233, 235. A flash-light, or the globe-light which she had at hand, manifestly ought to have been exhibited to the steamer as early as the time of the schooner's last tacking, and continued at least until her own red light should be clearly shown to the steamer. Had this been done, there can be no doubt the light would have been seen on the steamer, and the collision avoided. The omission of the light or any other timely signal was therefore a fault contributing to the collision. The fault of the schooner did not, however, excuse the steamer for the inattention of the lookout, in the special circumstances above noted. The damages must therefore be divided.