## COOPER *et al. v.* THE SARATOGA.

*(Circuit Court, S. D. New York. November 14, 1889.)*

ADMIRALTY—APPEAL—REVIEW.

A finding of the district court, on libel for damages by collision, that both vessels were in fault, will not be disturbed on appeal, when no new proofs are taken, and the evidence was conflicting, and the finding turned on the credibility of witnesses who were examined in the presence of the district judge, though the testimony seems to warrant another conclusion.

In Admiralty. Libel for damages. On appeal from district court, 37 Fed. Rep. 119.

*Hyland & Zabriskie,* for claimant.

*Wing, Shoudy & Putnam,* for libelants.

WALLACE, J. The libelants are the owners and crew of the schooner L. Holbrook, and sue for the loss of the vessel and the effects of the crew by a collision with the steamboat Saratoga, which took place in the Hudson River just opposite Catskill point on the night of August 15, 1888, about half-past 11 o'clock. The night was cloudy, and betokened rain. The moon was about setting, and had sunk behind the hills which lie on the west of the river, and, although the stars were visible at times through the rifts in the clouds, when the collision took place the night was exceptionally dark. Where the collision took place the trend of the river is north and south for some little distance, and the channel is narrow, the width being 600 or 700 feet. The vessels collided near the middle of the channel, but somewhat to the westward. The tide was ebb, and the wind was very light from the south-east. The Saratoga was a large steamer, making regular trips between the cities of Troy and New York, and running upon schedule time. She was bound down the river, making her usual speed, going about 14 miles an hour through the water, and had 225 passengers and a large cargo of freight. Her course was to the westward of the mid-channel. Two pilots were

at the wheel in the pilot-house on the front of the hurricane deck, and a lookout was stationed forward on the promenade deck. The schooner, carrying a cargo of 90,000 bricks, was also bound down the river. Her master was at the wheel, and one of her crew was on the deck, but not acting as a lookout. The rest of the crew were below. While she was on the easterly side of the river, on her port tack, making to the west side, the schooner observed some of the lights of the steamer apparently a mile or more away. She ran out her port tack until she got as near as practicable to the west shore of the river, on a course so far to the southward that her lights were not visible to the steamer. She then came about, and headed on her starboard tack for the east side of the river, going at a speed of a mile or a little better an hour, and sagging with the tide down the river. After she came about the master saw the red light of the steamer, according to his statement, about half a mile away; and shortly after he saw both lights, and, as danger of collision then became apparent, he shouted to the steamer, and gave an alarm to his own men, who were below. The steamer did not see the schooner, but, hearing the alarm, stopped her engines, and after she discovered the schooner reversed her engines. She struck the schooner on the port side, near the main rigging, and the schooner sank almost immediately. The pilots in the wheel-house and the lookout of the steamer all testify that although they heard the alarm on board the schooner, and tried to discover her, they could not do so until she was right under the steamboat's bow. When the alarm was given the vessels were so near together that the seaman on the schooner, who was standing by the starboard rigging, upon hearing the master's alarm had only time to jump from the top of the cargo to the forward deck, and run around to the port side, and back again to the starboard side, before the vessels struck. By the decree of the district court both vessels were held to be in fault, and the damages of the libelants were divided. The district judge was of the opinion that the schooner was in fault because she did not show any signal, neither a flash-light nor the globe lamp which she had at hand, to the approaching steamer, although her own colored lights were obscured from the observation of the steamer during all the time she was on her port tack and was coming about upon her starboard tack. He was of the opinion that the steamer was in fault because she ought to have seen the schooner, notwithstanding the circumstances, at a distance of at least 500 feet, and that her failure to do so was to be attributed to inattention on the part of the lookout. Both parties have appealed.

The only serious questions in the case are those of fact. Even if the schooner was not under a statutory obligation to exhibit a flash-light,—as to which it is not necessary to express an opinion,—upon the state of facts found by the district judge it was her duty to employ active vigilance to avoid collision, and in this behalf to give some indication of her presence to the steamer. *The Oder,* 13 Fed. Rep. 272; *The Victoria,* 3 W. Rob. 49; *The Anglo-Indian* and *The Earl Spencer,* 33 Law T. (N. S.) 233, 235; *The Thomas Martin,* 3 Blatchf. 517. The steamer was also in fault, if, as was found by the district judge, she ought to have seen the

schooner at least 500 feet away, although the lights of the latter were obscured, and failed to do so because her lookout was inattentive at the critical time.    The case is not one in which it can be seen that the fault of either vessel was not contributory to the collision.    As the witnesses were examined in the presence of the district judge, and no new proofs have been taken by the parties in this court, his conclusions of fact ought not to be disturbed by this court if they turn upon a question of the credibility of the witnesses for the respective parties.    It seems improbable that if the red light of the schooner had been visible to the steamer at any time after she had come about on her starboard tack it would not have been observed by one of the pilots or the lookout, or that they would have failed to see her even with her lights obscured, if she had been visible at a distance of 500 feet.    It seems improbable that the pilots, situated as they were, where their opportunities for observation were favorable, and exercising the vigilance to be expected when in charge of a steamer carrying a large number of passengers and a cargo of valuable freight, would not have seen the schooner if she had been plainly visible; or that, if their inattention had been otherwise momentarily occupied, they would perjure themselves as to the fact when there was a lookout at his proper place, upon whose vigilance they had a right to rely, and when blame could not reasonably be imputed to them.    But the district judge discredited their testimony, as well as the testimony of the lookout, as to the impracticability of seeing the schooner a sufficient distance away to avoid collision because of the darkness of the night.    He had an opportunity to observe the bearing and appearance of these witnesses, and to judge whether they appeared to be candid and truthful or not.    This court has no such opportunity, and any impression derived from reading their testimony should give way, where the proofs present a fair conflict of fact, to the judgment of the district judge based upon the personal observation of the witnesses.    The decree of the district court is affirmed.    Neither party is entitled to the costs of the appeal, both having appealed.