**AFRAN TRANSPORT COMPANY,**
Libelant,

v.

**THE** Motor Tanker **BERGECHIEF,** her engines, machinery, etc., A/S Sneffon, Claimant.

**A/S SNEFFON,** Cross-Libelant,

v.

**AFRAN TRANSPORT COMPANY** and **THE S.S. BURGAN,** her engines, boilers, etc., Cross Complainant-Respondent.

United States District Court
S. D. New York.

Feb. 19, 1959.

Burlingham, Hupper & Kennedy, New York City, Proctors for Afran Transp. Co., Stanley R. Wright, H. Barton Williams, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, Proctors for A/S Sneffon, MacDonald Deming, Richard G. Ashworth, New York City, of counsel.

LEVET, District Judge.

The libelant, Afran Transport Company, owner of the Steam Tanker Burgan, brings this suit by reason of a collision off Portland, Maine, on May 24, 1955, between the Burgan and the Motor Tanker Bergechief, owned by A/S Sneffon. The cross-libellant, A/S Sneffon, contends that the Burgan was solely responsible for the collision with the Bergechief. The two cases were consolidated for trial and were tried by the court without a jury.

The only witnesses who testified in person at the trial were William W. Kuhne and Hilliard L. Lubin, experts on behalf of the libelant, Afran Transport Company, and Harry Manning, an expert who testified on behalf of the cross-libelant A/S Sneffon. References hereinafter made to the testimony of these witnesses are to the stenographer's minutes of the trial. All other testimony, including that of Gunnar Larsen, captain of the Bergechief, Vincenzo Persico, a watch officer and third mate of the Burgan, George H. Lubee, a pilot at Portland harbor, and Theodore A. Langzettel, master of the Portland pilot boat, was by deposition. References hereinafter made to the testimony of these witnesses are to their respective depositions, each of which has been marked as an exhibit in evidence, as follows:

Deposition of Larsen — Exhibit 10
Deposition of Persico — Exhibit K
Deposition of Lubee — Exhibit 11
Deposition of Langzettel — Exhibit 12

After hearing the testimony, examining the pleadings, exhibits, briefs and proposed findings submitted by the respective parties, this court makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. On May 24, 1955, the Motor Tanker Bergechief was employed on a voyage from the Caribbean area to Portland, Maine, with a full load of crude oil. The Bergechief was built in Gothenburg, Sweden, in 1949; she is and was at the times concerned owned by claimant-cross-libelant A/S Sneffon and registered under the Norwegian flag. Her characteristics are as follows: Length overall 559'0", Breadth 69'9", Draft summer 30'5", Gross tonnage, 11,720, Net tonnage, 6,951, Summer deadweight tonnage 18,500. The Bergechief is a single screw ship with Burmeister and Wain diesel engines. (See Stipulation, Bergechief Exhibit 13, item 1)

2. The Bergechief's wheelhouse was equipped with a Raytheon model 1197 "Pathfinder" radar set, the scope of which is 7" in diameter; and the pamphlets entitled "Mariners Pathfinder Radar, Operation and Maintenance Manual for Models 1197 and 1218" and "Mariners Pathfinder Radar, Instructions for Operation and Maintenance of Models 1197 and 1218" are operating manuals for the Bergechief's radar. (See Stipulation, Bergechief Exhibit 13, item 3)

3. On May 24, 1955, the Steam Tanker Burgan was leaving Portland, Maine, in ballast. The Burgan was built in Sparrows Point, Maryland, in 1949; she is and was at the times con-

cerned owned by libelant-cross-claimant-respondent, Afran Transport Company, and registered under the Liberian flag. Her characteristics are as follows: Length overall 624'10", Breadth 84'5", Draft summer 33'3¾", Gross tonnage 17,905, Net tonnage, 11,071, Summer deadweight tonnage 28,336. The Burgan is a single screw ship equipped with steam turbines generating 13,750 shaft horsepower. (See Stipulation, Bergechief Exhibit 13, item 2)

4. At or about 8:31 a. m. on May 24, 1955, less than a mile to the westward of the Portland, Maine, light vessel, the Bergechief and the Burgan collided in dense fog.

5. On the morning of the collision Bergechief was using maneuvering speeds, which were about as follows: Full ahead 11 knots, half ahead 7 knots or more, slow ahead 3–4 knots, dead slow 3 knots. (Larsen, Exhibit 10, pp. 119–120) The Bergechief could maintain steerageway at two or three knots with the propeller working ahead and at five or six knots with the propeller stopped. (Larsen, p. 46)

6. Burgan could maintain steerageway at about one knot. Under the prevailing conditions her speed through the water at dead slow ahead was two to three knots, at slow slightly under seven knots, and at half speed ahead in excess of seven knots. Her full speed ahead at sea was about seventeen knots. (Persico, Exhibit K, pp. 178–181; Kuhne, pp 119–120; Burgan chart, Exhibit G; Burgan bellbook, Exhibits E and H)

7. On the morning of the collision the tidal current ran northwesterly into Portland; the wind was southerly, force 3 to 4, and the visibility was practically nil.

8. Until 8:10 a. m. on May 24, 1955, the Bergechief was heading for Portland light vessel on a course of 345° true; then she reduced to half speed, altered the course to 320° true to bring her south of the light vessel in accordance with the directions given by the Portland pilots on previous trips.

9. At 8:14 the Bergechief reduced her speed to slow ahead and at 8:17 stopped her engines. Then she altered her course to 307° true and at 8:20 went dead slow ahead. At 8:22 the light vessel was abeam at a distance of ½ mile on a 35° true bearing and the engines were again stopped to await the pilot.

10. Although her Raytheon "Pathfinder" radar was functioning properly, the Bergechief, which had been observing the Burgan on radar since 8:00, discontinued radar observations slightly after 8:22. Gunnar Larsen, captain of the Bergechief, testified that when he last saw the Burgan on radar the vessels were approximately 1 to 1¼ nautical miles apart. (Larsen, p. 126) When Captain Larsen took his bearing of the light vessel at about 8:22, the Burgan showed plainly on his radarscope. However, he was under the impression that she was at anchor or inbound awaiting a pilot. (pp. 32, 34–35)

11. About seven or eight minutes before the collision and while Bergechief's engines were stopped, Bergechief heard for the first time the fog signal of Burgan which bore 30 to 45° on Bergechief's starboard bow and appeared to be heading towards the Bergechief. Captain Larsen estimated that the vessels were then under a mile apart. (p. 58)

12. At or about 8:26, the Bergechief gave a slight kick ahead of its engines at dead slow while on a course of 307°. Bergechief heard a second whistle signal which her master took to be a shorter than usual fog signal. There is conflicting evidence as to whether this signal was heard before or after the slight kick ahead of the Bergechief's engines. (See Larsen, p. 23 and Bergechief's log entry, Exhibit 1) In any event, it is clear that the Bergechief neither recognized nor acted upon this signal as indicating that the Burgan was turning to starboard.

13. The Bergechief thereafter heard a third signal, which was a regular fog signal, followed by a fourth of allegedly shorter duration. It was at this time that the Bergechief's master realized

that the Burgan was altering course to starboard.

14. Until shortly before 8:29, the speed of the Bergechief was 5 knots, which, according to Captain Larsen, was the minimum speed required by the Bergechief to maintain steerageway with its propellers stopped. (Larsen, p. 46)

15. Prior to 8:29, Captain Larsen knew that the Burgan was approaching in the path of the Bergechief and that he risked collision by maintaining Bergechief's forward way on the course it was then pursuing. However, he was counting on the Burgan's use of radar to avoid collision. (pp. 66–67)

16. At 8:29 Bergechief's engines were reversed to full speed astern and a three-blast signal blown to indicate this. For over 1½ minutes after 8:29 Bergechief continued with her engines at full speed astern and still heading at 307°, whereupon the Burgan was sighted about 100 to 200 feet off the starboard bow crossing the Bergechief's bow at almost right angles.

17. The collision occurred about 10 to 15 seconds after the Burgan was sighted; the angle between the port sides of the vessels was about 80°, the top of the Bergechief's bow being in collision with the top portion of the Burgan's port side shell plating in the way of the No. 7 tank, which was pushed in as the Burgan scraped by, but without any penetration into the Burgan's hull. At the time of the collision, the Bergechief had headway of under half a knot. (Kuhne, p. 133; Persico, p. 169)

18. At the time of the collision and for a considerable period prior thereto, the Bergechief did not have a bow lookout. The lookout had been ordered aft to pull in the log when the Bergechief approached the light vessel. He was aft at the time the Burgan's fog signal was first heard; shortly before the collision he was on the bridge. (Larsen, p. 60)

19. At the time of the collision and for several minutes before the collision Captain Larsen had been in the wheelhouse. The windows of the wheelhouse

were closed, though its door was open. The chief mate was running in and out of the wheelhouse. (Larsen, pp. 50–51) At 8:00 the Bergechief's chief mate had gone to breakfast, leaving only Captain Larsen and the wheelman at the bridge until the chief mate's return at about 8:15.

20. The Burgan had left her berth in Portland, Maine, on the morning of May 24, 1955, outbound to Venezuela, at or about 6:30. The pilot on the outgoing Burgan planned to take this vessel to the vicinity of the Portland light vessel and from there bring in the incoming Bergechief.

21. The Burgan, in dense fog, proceeded down the channel course of 141° true. (Lubee, p. 5) She passed the last channel buoys on Corwin Rock and West Cod Ledge Rock, which are three miles northwest of the light vessel, at 7:55. At 8:08 she stopped her engines to await the pilot boat, which came along at about 8:17. As the pilot came alongside, the engines were put at slow ahead and her heading changed to port to 130° true. Shortly before the Burgan dropped her pilot, the light vessel bore 142° true from Burgan, or about 12° off the Burgan's starboard bow (Lubee, p. 5) at a distance of somewhat under one mile. (Langzettel, p. 221)

22. Before leaving Burgan's bridge, the pilot told her master about the inbound Bergechief, which the pilot was going to board and bring into Portland. The pilot asked the master to stay on a course of 130°. However, there is some question as to whether the pilot's instructions were understood.

23. At 8:19, the pilot was dropped by the Burgan, and at 8:20 the Burgan's engines were put at half speed and her course altered right to 172° true for Cape Cod Whistling Buoy. This brought her to the westward of the light vessel.

24. Vincenzo Persico, a watch officer and third mate of the Burgan, testified, and I so find, that the Burgan first heard the Bergechief's fog signal at 8:22. (p. 159) However, I do not believe Persico's testimony that the Burgan's speed was

thereupon reduced from half ahead to dead slow ahead in view of the alterations contained in both the Burgan bridge bell book and engine bell book, which indicate that the reduction in speed occurred not at 8:22 but rather at 8:26 or 8:27.

25. At or about 8:26 or 8:27 the Burgan reduced her speed to dead slow ahead, the rudder was turned hard right and she sounded a short whistle blast.

26. At 8:29½ the Burgan whistle gave three short blasts, indicating that her engines were going astern. The Burgan thereupon went half speed astern, and at 8:30, full speed astern.

27. The Burgan, still under her hard right rudder, sighted the Bergechief about 10 seconds before the collision. The Burgan had considerable headway and scraped along the Bergechief, skidding to her left towards the Bergechief. (Perciso, pp. 201–202; Manning, p. 170; Kuhne, p. 130)

28. The collision occurred about a mile to the west of Portland light vessel. (Larsen, Exhibit 10, pp. 30, 36; Larsen Chart, Exhibit 9; Langzettel, Exhibit 12, pp. 226, 240)

· 29. Until her emergency reverse engines at 8:29, Burgan was maintaining a speed far in excess of that required for bare steerageway.

30. In the opinion of the court, the Burgan contributed to the collision by the following acts:

(1) The speed was grossly immoderate under the fog conditions prevailing;

(2) The Burgan failed to stop her engines upon first hearing the fog signal of the Bergechief which indicated that the Bergechief was dead ahead of the Burgan;

(3) The hard right change of course of the Burgan at 8:26 or 8:27, at which time she had not ascertained the position or speed of the Bergechief, constituted negligence.

31. In the opinion of the court, the Bergechief contributed to the collision by reason of the following:

(1) In kicking her engines ahead at or about 8:26;

(2) In failing to navigate with caution after hearing the signal of the Burgan;

(3) In failing to reverse engines prior to 8:29;

(4) In failing to keep a lookout;

(5) In failing to make use of radar from shortly after 8:22 until the time of the collision.

### Discussion

The Burgan's negligence both in respect to its speed and the starboard turn which brought it across the bow of the Bergechief is, in my opinion, sufficiently patent to require no discussion.

■■ It is well settled that in a fog a vessel must proceed at a moderate rate of speed, and upon hearing the signal of an approaching vessel ahead must stop its engines and navigate with caution. Anglo-Saxon Petroleum Co., Limited of London, England v. United States, 2 Cir., 1955, 224 F.2d 86; Johnston-Warren Lines, Limited v. United States, 2 Cir., 1952, 196 F.2d 689; 33 U.S.C.A. § 145n (b); 33 U.S.C.A. § 192. The Burgan, in my opinion, violated each of these rules.

■ I am, however, not persuaded that the outbound Burgan was at fault in failing to proceed on the course of 130° advised by pilot Lubee, nor am I persuaded that the Bergechief was at fault in using a course of 307° rather than some other inbound course. I do not believe that the courses used by the Burgan and the Bergechief were prohibited by the "United States Coast Pilot" (Exhibit O) or that their use, *standing alone*, was a contributing cause of the collision.

The Bergechief seeks to place full responsibility for the collision on the Burgan, contending that none of its acts contributed to the accident. The Bergechief contends that:

(1) Bergechief's speed and navigation were under all of the prevailing circumstances within the dictates of good seamanship;

(2) Absence of a bow lookout on the Bergechief did not contribute to the collision;

(3) The Bergechief's decision not to watch her radar during the period after she heard the fog signal of the other vessel up to the collision was a reasonable exercise of the master's discretion, and in any event did not contribute to the collision, since in the close-quarters situation facing Bergechief, no usable information regarding the Burgan could have been obtained from radar additional to that already in the possession of the master of the Bergechief.

Specifically, the Bergechief argues:

(1) That the Bergechief had no headway at the time of the collision; that the Bergechief was going so slowly that she was able to cease all headway prior to the collision after less than two minutes of proceeding full astern. The fact that the bow of the Bergechief did not penetrate the plate of the Burgan is cited to sustain this argument. Captain Kuhne, the expert called by the Burgan, conceded that the Bergechief's headway was probably less than ½ knot, which, when computed, is equivalent to a speed through the water of only 50 feet per minute or only 8 to 12 feet in the 10 to 15 seconds while the vessels were in sight. Captain Larsen of the Bergechief testified that the ship was dead in the water, and Commodore Manning, the expert testifying for the Bergechief, stated that in his opinion the speed of the Bergechief was nil, basing this conclusion upon the fact that if the Bergechief had had the slightest headway she would have impaled herself into the side of the Burgan;

(2) That a lookout on the Bergechief's bow would have given her navigators no additional usable information. The Bergechief asserts that the mere fact of a defective lookout does not result in liability since for over a minute and a half prior to the collision the Bergechief was being navigated with engines full astern—in other words, it was already doing all it could to avoid collision. To state the proposition another way, apparently the Bergechief argues that the absence of a lookout cannot provide the basis for liability where his presence would not have avoided the accident;

(3) That use of the radar was discontinued because it could no longer supply useful information with respect to the Burgan and that between the Burgan's hard right turn at 8:26 or 8:27 and the Bergechief's full astern at 8:29 there was insufficient time for the Bergechief to perceive from her radar that any change in relative motion had occurred; that it was impossible for the Bergechief to determine from a radar plot Burgan's course and speed because it was impossible for Bergechief to know her own speed since she was decelerating, and, further, that there was not sufficient time available to Bergechief to permit her to plot the course and speed of Burgan. The Bergechief avers that ten minutes would have been insufficient time to calculate from radar observations the course and speed of another vessel.

Bergechief's contentions, above mentioned, in my opinion, lack merit.

Despite the testimony of Captain Larsen and Commodore Manning to the contrary, I am inclined to agree with Captain Kuhne's conclusion that the Bergechief had headway of about half a knot at the time of the collision. (Kuhne, p. 133; Persico, p. 169)

Though the Bergechief's engines were stopped when the Burgan's fog signal was first heard, the engines were given a kick ahead at 8:26, allegedly in order to maintain steerageway. Failure to comply with the moderate speed requirement in fog is not excused by the desire to maintain steerageway. Anglo-Saxon Petroleum Co. v. United States, supra. The same is, in my opinion, true of the requirement that a vessel stop its engines and navigate with caution upon hearing the signal of an approaching vessel ahead of it. But for the kick ahead of its engines, the Bergechief's reversal of engines at 8:29 might have been effective to avoid the collision. Under these circumstances the kick ahead

of the Bergechief's engines at 8:26 constituted negligence.

■ In any event, the maintenance of the minimum steerageway speed of approximately 5 knots until shortly before 8:29, the failure to have a bow lookout or to utilize radar and the failure to recognize or act upon Burgan's short signal at 8:26 or 8:27 clearly indicates that the Bergechief was not being navigated with caution.

Captain Larsen's deposition contains numerous indications of his indecision, vacillation and confusion in the face of imminent danger. He admitted that at about 8:00 he had probably mixed up the whistle from the light vessel with that of the Burgan. (p. 54) At about 8:22 Captain Larsen was under the false impression that the Burgan might be a stopped or incoming ship waiting for a pilot. (pp. 34–35) After hearing the Burgan's whistle signal, Captain Larsen and his chief officer were speculating as to the Burgan's intentions. (p. 60) Captain Larsen was in doubt as to whether the Burgan would pass astern or ahead of the Bergechief. (p. 61) He heard a signal from the Burgan which he described as quicker and shorter than an ordinary fog signal, but, nevertheless, continued the Bergechief's forward way. (p. 22) He maintained a course of 307° despite an increasing awareness of the Burgan's approach, counting on the Burgan's use of radar to enable it to maneuver safely past the Bergechief. (pp. 66–67) The Bergechief's engines were finally reversed at 8:29, when Captain Larsen claims to have again heard a shorter signal and could hear that the Burgan was going ahead of the Bergechief. (p. 23)

■ The Bergechief could not simply rely upon the Burgan to avoid the collision. It was under a duty to act affirmatively to extricate itself from its position of danger.

■ In my opinion, cautious navigation and good seamanship would have required the Bergechief to reverse engines prior to 8:29, and the failure to do so was a contributing cause of the collision.

It is not necessary for this court to conjecture as to whether the Bergechief should have reversed its engines a minute or two minutes prior to 8:29 in order to have avoided the collision, or, indeed, whether the collision would surely have been avoided if the Bergechief's engines had been reversed promptly upon hearing Burgan's short signal at 8:26 or 8:27. As stated in Anglo-Saxon Petroleum Co. v. United States, 2 Cir., 1955, 224 F.2d 86:

"* * * We cannot of course know whether the collision would have been avoided, if The Goldshell had been put at full speed astern from the moment that she saw the green light of The White Plains, but that will not excuse her. It rested with her to show that the collision did not, and indeed could not, have resulted from either of the faults of which she was guilty." 224 F.2d at page 88.

■ At the time of the collision, the Bergechief was not maintaining a lookout. The importance of a lookout is self-evident. Chamberlain v. Ward, 1858, 21 How. 548, 62 U.S. 548, 570; The Ariadne, 1871, 13 Wall. 475, 80 U.S. 475, 478, 20 L.Ed. 542. "The vigilance of the lookout ought to be proportionate to the danger." The Saratoga, D.C.S.D. N.Y., 1888, 37 F. 119, 120–121, affirmed 1889, 40 F. 509. "The denser the fog and the worse the weather the greater cause for vigilance." The Sagamore, 1 Cir., 1917, 247 F. 743, 744, 755. The proper place for a lookout is under ordinary circumstances on the bow. The Manchioneal, 2 Cir., 1917, 243 F. 801, 805. He should not be stationed on the bridge. Griffin on Collision, p. 273. A lookout must use his ears, as well as his eyes, and must report what he hears as well as what he sees. The Felix Taussig, 9 Cir., 1925, 5 F.2d 612, 615.

■ If a ship fails to have a lookout, the burden is upon that ship to show

that this failure did not contribute to the collision. The Madison, 2 Cir., 1918, 250 F. 850, 852. The burden is on the offending vessel to show that her deficiency could not have contributed, or at all events did not contribute, to the collision. Griffin on Collisions, p. 283. "Every doubt as to the performance of the duty, and the effect of non-performance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary." The Ariadne, 1871, 13 Wall. 475, 80 U.S. 475, 479, 20 L.Ed. 542.

The rule has been stated by Griffin as follows:

" * * * If the vessel fails in her duty as to lookout, the burden is on her to show her freedom from fault; but, if it appears that her navigators in fact had all the information which a proper lookout could have given, or that their navigation was just what it ought to have been if they had had such information, the failure in lookout will be held a non-contributory fault." Griffin on Collision, p. 263.

In my opinion, a lookout at the bow of the Bergechief would have been better able to determine the nature and direction of the signals coming from the Burgan than were those on the Bergechief's bridge. Had the Bergechief correctly interpreted the short signal sounded by the Burgan at 8:26 or 8:27 to indicate that she was turning to starboard, the Bergechief would have had an opportunity to reverse her engines about two minutes prior to the time she actually did so. Under these circumstances, the failure to maintain a bow lookout constituted negligence on the part of the Bergechief and was a contributing cause of the collision.

Similarly, I have concluded that the Bergechief's failure to make use of its radar from slightly after 8:22 until the time of the collision was a contributing cause of the accident. I am not impressed with the Bergechief's claim that its radar would have been totally useless as an anti-collision device during the critical seven or eight minutes prior to the collision.

Richard L. Lubin, a radar expert, testified that a competent radar operator could get a general indication of the course and speed of another vessel after three minutes' observation. (pp. 151–152); that in ten minutes a competent radar operator could ascertain another vessel's speed and course twice or three times (pp. 154–155); that with constant observation a competent radar operator could get a bearing and distance on his target, whether moving or otherwise, some seven or eight times a minute (p. 150), and that the minimum effective range of radar for a ship target such as the Burgan is between 100 and 200 yards. (p. 146)

In my opinion, proper use of its radar equipment would have apprised the Bergechief of the Burgan's speed and direction prior to its starboard turn at 8:26 or 8:27 and might perhaps have warned the Bergechief of that turn in sufficient time to have enabled it to avoid the accident.

As stated by Byers, District Judge, in The Medford, D.C.E.D.N.Y., 1946, 65 F. Supp 622, 626: "The perfection of that device [radar] is thought to have invoked a new concept of the responsibilities attaching to vessels so equipped, touching their handling and operation in or near a fog-bound area." The invention of radar has increased many times man's ability to "see." 32 Cornell Law Quarterly 570.

The failure of the Bergechief to utilize this anti-collision device under conditions of extreme danger was a factor contributing to the collision.

### Conclusions of Law

1. The court has jurisdiction of the parties and subject matter of this cause.
2. The Steam Tanker Burgan and the Motor Tanker Bergechief was each at fault in the collision which occurred off Portland, Maine, on May 24, 1955.

3. Afran Transport Company is entitled to an interlocutory decree against A/S Sneffon for one-half of the damage sustained by the Burgan as a result of the collision, together with costs and such interest, if any, as this court may determine upon the entry of the final decree herein.

4. A/S Sneffon is entitled to an interlocutory decree against Afran Transport Company for one-half of the damage sustained by the Bergechief as a result of the collision, together with costs and such interest, if any, as this court may determine upon the entry of the final decree herein.

5. The amount of damage to the respective vessels is to be determined by a special master to whom this matter is to be referred for such purpose.

Submit interlocutory decree on notice in accordance with the foregoing.