AFRAN TRANSPORT CO., Appellee-Cross-Appellant,

v.

THE BERGECHIEF, her engines, etc., A/S Sneffon, Appellant-Cross-Appellee.

A/S SNEFFON, Appellant-Cross-Appellee,

v.

THE BURGAN, her engines, etc., and Afran Transport Company, Appellee-Cross-Appellant.

Nos. 129 and 130, Docket 25600 and 25601.

United States Court of Appeals Second Circuit.

Argued Nov. 18, 1959.

Decided Jan. 26, 1960.

MacDonald Deming, New York City (Richard G. Ashworth, Terence J. Creighton, and Haight, Gardner, Poor & Havens, New York City, on the brief), for appellant-cross-appellee, A/S Sneffon.

Stanley R. Wright, New York City (H. Barton Williams and Burlingham, Hupper & Kennedy, New York City, on the brief), for appellee-cross-appellant, Afran Transport Company.

Before MAGRUDER, MEDINA and FRIENDLY, Circuit Judges.

MEDINA, Circuit Judge.

At 8:31 a. m. on May 24, 1955, on the tail end of the flood tide going into Portland, Maine, and less than a mile west of the Portland light vessel, two tankers collided in a dense fog, with visibility zero. The trial judge found both vessels to blame and his opinion and findings are reported at 170 F.Supp. 893.

The larger of the two vessels was the single screw Steam Tanker Burgan, 624′ 10″ long with a beam of 84′ 5″, of 17,- 905 gross tons. She was light and outbound for Venezuela in ballast. The Motor Tanker Bergechief, also a single screw vessel, had an overall length of 559′ 0″, 69′ 9″ abeam and a gross tonnage of 11,720; she was inbound from the Caribbean with a full load of crude oil, 18,500 tons deadweight. The Bergechief was equipped with a Raytheon Model 1197 "Pathfinder" radar set with a 7″ radarscope together with the necessary operating manuals; and this radar was in good operating condition and functioning properly. The Burgan was also equipped with radar and had it in continuous use up to the time of the collision.

At the moment of impact both vessels were going full speed astern. The Burgan still had considerable headway and just managed to scrape by the bow of the Bergechief whose forward motion had almost but not quite stopped. The speed of the Bergechief was found to be one-half knot and it may well have been less. The vessels met at an angle of 80°.

The principal burden of Bergechief's argument, as we understand it, is to convince us that the sole fault found against her was for what she did or did not do in the two or three minute period immediately before the collision. We do not so interpret the findings. In this case, as in most, if not all collision cases, it is necessary to go back and get a clear picture of the vessels as they approached one another. Thus one can see the likelihood of collision as it develops, until the moment when, even though the masters of the two vessels may not realize it, the collision is all but inevitable. In this way faults of navigation may be more accurately determined. Applying this method of analysis, we find there was faulty navigation by the Bergechief from the time she turned off her radar, or shortly thereafter.

Long before the Bergechief arrived abreast the Portland light vessel, and as early as 8:00 she observed the Burgan some miles away in her radarscope. The Burgan did not drop her pilot until 8:19. At 8:22 the Bergechief had the light ves-

sel abeam about a half mile away on a 35° true bearing. Assuming, without the slightest justification for doing so, that the Burgan was at anchor or was inbound awaiting a pilot, the Bergechief stopped her engines and turned off her radar at 8:22. Heavily loaded as she was she glided along running off her way at about five knots on a 307° true course, to await her pilot. The vessels were then a mile to a mile and a quarter apart. No fog signals of the Burgan had yet been heard on the Bergechief. The lookout on the Bergechief's bow was sent aft to take in the log.

In the meantime at 8:20 the Burgan's engines were put at half speed, or something in excess of seven knots and she altered her course to starboard at 172° true for Cape Cod Whistling Buoy. From this moment the danger of collision increased with each passing moment. Both vessels were sounding fog signals but the intervals between those of the respective vessels and the precise duration of each blast are not clear.

In any event, the Burgan first heard the Bergechief's fog signal at 8:22; the Bergechief first heard the Burgan's fog signal at 8:23 or 8:24, and it was estimated to come from about a mile away at three to four points off the Bergechief's starboard bow.

As the Bergechief was losing steerageway her engines were given a kick ahead at dead slow for what the master describes as a very brief period of time, perhaps five or ten seconds. This was at 8:26. About the same time the Bergechief heard a short signal blast, followed by a normal fog signal from the Burgan. The trial judge was unable to determine whether the kick ahead came before or after the short blast. At 8:27 the Burgan altered her course hard right to starboard under dead slow. Thus from a course more or less head to head the Burgan started to cross the Bergechief's bow.

The exchange of fog signals soon made it apparent that a collision was imminent and at 8:29 Bergechief went full speed astern. Bergan went half speed astern at 8:29½ and full speed astern at 8:30. The collision occurred at 8:31. Further details appear in the findings and opinion below.

We agree with Judge Levet that the faults of the Burgan are "sufficiently patent to require no discussion." [170 F.Supp. at page 898]. Her speed was grossly excessive. Upon hearing the signal of an approaching vessel ahead, whose position, course and speed were not precisely known, she should have stopped her engines and navigated with caution. Art. 16, 33 U.S.C.A. § 192, applicable to Inland Waters; Anglo-Saxon Petroleum Co. v. United States, 2 Cir., 1955, 224 F.2d 86; Johnston-Warren Lines v. United States, 2 Cir., 1952, 196 F.2d 689. The conceded erasures and changes in her ship's records are most damaging, especially on the issue of her speed. Her blind alteration of course hard right to starboard, on a mere guess that she might thus avoid collision was clearly a fault, and it was also a fault to give a port to port passing signal, if that is what she did, as Art. 18, Rule IX, 33 U.S.C.A. § 203, applicable to Inland Waters, prohibits the sounding of any signal other than a fog signal when vessels are not in sight of each other. Such a breach of the rules is bound to cause confusion and increase the probability of a collision. Moreover, if her radar was being properly operated by a competent man, it is difficult to understand how she was permitted to barge ahead into such a dangerous situation. In any event, we hold that the mere use of radar does not justify a failure to obey the rules of navigation generally applicable. Radar is an additional safeguard, and a failure to use it may constitute negligence, as we shall see, but a master who relies on radar alone and disregards any or all other precautions and requirements, statutory or otherwise, does so at his own risk. The Miguel de Larrinaga [1956] 2 Lloyd's List L.R. 530, 538; The Chusan [1955] 2 Lloyd's List L.R. 685, 695; The Prins Alexander [1954] 1 Lloyd's List L.R. 281, 290, aff'd [1955] 2 Lloyd's

List L.R. 1; Gratsos v. The Baranof [1953] Can.Exch. 74, 81, 1953 A.M.C. 393, 400. See also International Convention for the Safety of Life at Sea, 1948, reprinted in 1953 A.M.C. 1, 83; H.R.Rep.No. 2969, 84th Cong., 2d Sess. 10 (1957). Indeed, it is surprising how many collisions continue to occur despite the fact that both vessels are equipped with and are operating radar. We have already had occasion to comment on the fact that by giving a false sense of security radar, when not properly used may "increase the chances of collision." Polarus Steamship Co. v. The T/S Sandefjord, 2 Cir., 1956, 236 F.2d 270, 271.

The faults attributed to the Bergechief by the trial judge are the following:

(1) In kicking her engines ahead at or about 8:26;

(2) In failing to navigate with caution after hearing the signal of the Burgan;

(3) In failing to reverse engines prior to 8:29;

(4) In failing to keep a lookout;

(5) In failing to make use of radar from shortly after 8:22 until the time of the collision.

■■ We agree that the brief kick ahead at 8:26 constituted negligence and it contributed to the collision. It was apparent that the vessels were in close proximity. This kick ahead certainly did not diminish the Bergechief's headway, and we believe it necessarily somewhat increased her speed. In a dense fog such as we have in this case and in open water a vessel is not entitled to maintain steerageway, particularly in the absence of current of substantial force. Anglo-Saxon Petroleum Co. v. United States, 2 Cir., 1955, 224 F.2d 86; The Southern Cross, 2 Cir., 1937, 93 F.2d 297, 299; The Youngstown, 2 Cir., 1930, 40 F.2d 420, 421.

■ The second specification of fault against the Bergechief seems to be based, at least partly, upon her "failure to recognize or act upon Burgan's short signal at 8:26 or 8:27." We cannot agree with

this as no such signal is permitted under the Rules, as we have already noted. Moreover, we are not persuaded that the so-called short blast by the Burgan was intended to indicate a change of course to starboard. It may well have been just another fog signal. But if it was intended to indicate a change of course this was an improper signal and we cannot charge the Bergechief with fault for misinterpreting it.

■ We agree that the failure to reverse her engines prior to 8:29 was negligence. Both vessels were aware of each other's presence and neither of them had more than a general knowledge of the course of the other. Neither knew, so far as we can make out from this record, the speed at which the other was proceeding. Clearly it was the duty of each to reverse her engines and take off her headway sooner than she did.

■ Whether the absence of a bow lookout on the Bergechief contributed to the accident is a closer question. But this is a statutory fault and it is a heavy burden to prove that this deficiency "could not have contributed" to the collision. The Pennsylvania, 1873, 19 Wall 125, 136, 86 U.S. 125, 136, 22 L.Ed. 148; Merritt-Chapman & Scott v. Cornell Steamship Co., 2 Cir., 1959, 265 F.2d 537. We cannot characterize as clearly erroneous the finding that: "a lookout at the bow of the Bergechief would have been better able to determine the nature and direction of the signals coming from the Burgan than were those on the Bergechief's bridge."

■ The most interesting question in the case is that relating to the failure of the Bergechief to use her radar. We agree with Judge Levet that this was a fault and that it contributed to the collision. Moreover, we hold the Bergechief had the burden of proving that her failure to use her radar did not contribute to the collision, and it is clear beyond peradventure of doubt that she did not sustain this burden.

Radar is an electronic method of detecting objects and ascertaining their

range and bearing.[1] Essentially marine radar is a device that generates a narrow beam of radio waves, receives the echoes returned from any target in the area surrounding the ship and displays the returned echoes visually. For our purposes the crucial unit is the radarscope indicator, upon the face of which the distance and bearing of the object from the observing vessel is shown as a "pip" or blob of light which briefly appears at a distance and bearing from the center of the face of the radarscope corresponding to the distance and bearing of the actual object which is reflecting the beam. Thus the exact center of the radarscope represents the ship upon which the radar is installed. The pips appear a number of times, usually seven or eight per minute, corresponding to the number of revolutions of the device or antenna that transmits the radio waves. As the antenna continues its revolution the pip does not immediately disappear. An afterglow or "contrail" remains for a short time, and one pip after another leaves a "trail" which may be useful in close range work and give a rough indication of relative movement or of a change in relative movement.[2] The problem of interpretation of what appears on the radarscope will be discussed more fully below.

Though the question is not before us in this case, as both ships were equipped with radar, the question arises *in limine* as to the duty of a vessel to carry radar. No statute or regulation requires this.[3] And this is so though radar has to a considerable degree lessened the importance of other navigation aids[4] required aboard various types of vessels. Nor have the courts as yet formulated any rule requiring radar. A District Court has found that the failure of a destroyer to carry navigational radar in 1942 did not render her unseaworthy. Anglo-Saxon Petroleum Co. v. United States, D.C.Mass.1950, 88 F.Supp. 158.[5] However, conditions have changed since the fledgling days of radar in 1942 and the value of Anglo-Saxon Petroleum Co. as a precedent today is doubtful. Lurking in the background is T. J. Hooper, 2 Cir., 1932, 60 F.2d 737, certiorari denied, Eastern Transportation Co. v. Northern Barge Corp., 1932, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571, where in 1932, despite the absence of statutes, regulations or even custom as to radio receiving sets, Judge Learned Hand found a vessel unseaworthy for lack of one. Two barges had been lost in a storm and the tugs and their tows might have sought shelter in time had they received weather reports by radio. We think this case shows which way the wind blows and have little doubt that a rule requiring radar, subject to some limitations and qualifications, will sooner or later be formulated. But we do not decide the point as it is not necessarily involved in this case.

If a vessel carries properly functioning radar equipment and she is in or approaching an area of known poor visibility, there is an affirmative duty to use the radar. The Medford, D.C.E.D. N.Y., 1946, 65 F.Supp. 622, 626. See also The Hindoo, D.C.S.D.N.Y. 1947, 74 F.Supp. 145, 149–150, affirmed on this point, United States v. The Australian Star, 2 Cir., 1949, 172 F.2d 472, certiorari denied, 1949, 338 U.S. 823, 70 S.Ct.

1. For a more detailed description of marine radar see Wylie, The Use of Radar at Sea (3rd ed., 1958).

2. Id. at 149.

3. The United States Coast Guard Licensing Authority has, however, issued a regulation requiring those applying for licenses as deck officers in the merchant marine, or those deck officers applying for a raise in grade or an increase in the scope of their license, either to pass an examination on the proper operation and utilization of marine radar equipment or in lieu thereof to present a certificate from an approved radar school. 46 C.F.R. § 10.05–46.

4. E. g. the radio direction finder and the mechanical deep sea sounding apparatus. See Radar and Marine Collisions Today, 10 Hastings Law Journal 71, 75 (1958).

5. Compare The Chusan [1955] 2 Lloyd's List L.R. 685, where the Court said that one could "expect" to find a modern vessel equipped with radar.

69, 94 L.Ed. 499; Petition of United States, D.C.E.D.Va.1955, 131 F.Supp. 712, affirmed sub nom. British Transportation Commission v. United States, 4 Cir., 1956, 230 F.2d 139, affirmed 1957, 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234.

■ But the Bergechief does not deny there is a duty to use radar under circumstances that indicate it is needed and would supply useful information. Her point, as we understand it, is that the law invests the master with discretion not to use radar when, in his opinion, it cannot supply useful information, relying upon Pocahontas Steamship Co. v. The Esso Aruba, D.C.Mass.1950, 94 F.Supp. 486, 490. We fail to perceive how this case helps the Bergechief. The vessel that collided with the Esso Aruba stopped using radar because it had been picking up false targets and there was "a lot of interference." Under circumstances such as these it was held that it was not negligence to turn off the radar. As the trial judge in that case said, at page 490: "There might well be times when the continued use of radar by a navigator who was uncertain of the results he was observing and unwilling to place reliance thereon might well be foolhardy and hazardous." This does not mean that, in the face of the fact that a properly functioning radar will give useful and necessary information, the master has a discretion to decide that it will not give such information and turn off his radar. A master has no more discretion to disregard this aid to navigation than he has to disregard the use of charts, current tables and soundings where the circumstances require the use thereof. The real question on this phase of the case is, would the radar have provided information of such a character as to have made it clear to the Bergechief that she should have reversed her engines and stopped her headway of some five knots sooner than she did.

Both sides called experts and they testified in person at the trial. There was affirmative testimony by the Burgan expert, which Judge Levet accepted, that the minimum effective range for a ship target such as the Burgan is between 100 and 200 yards. Even without plotting, a competent radar operator could get a general indication of the course and speed of another vessel after three minutes' observation. It is clear that continuous observation from 8:22 when the Bergechief's radar was turned off, would have revealed that the Burgan was approaching on a collision course, as her bearing and the distance separating the vessels would have been shown at all times. Moreover, the trial judge may well have inferred that the master of the Bergechief turned off his radar because he mistakenly thought the Burgan was at anchor or inbound waiting for her pilot rather than because he did not "think he could do anything with the radar in so short a time."

■ It is likely that there was time for plotting, and this would have revealed the exact speed and course of the Burgan. We cannot be sure of this. Although her speed was diminishing, the estimate of five knots could not have been much out of the way; and it would seem to be a good general rule that if a radar pip shows another vessel nearby and forward on your starboard bow, you should stop and *make* the time for a plot.

■ Thus we conclude that the finding that it was a fault by the Bergechief not to use her radar and that this contributed to the collision will not be disturbed. And we hold further that in circumstances such as we have before us here the vessel that fails to use her radar has the burden of establishing that her failure to use radar did not contribute to the collision. That the Bergechief sustained no such burden in this case is too clear for reasonable debate.

Affirmed.