Kai GRANHOLM, Plaintiff,

v.

The Vessel TFL EXPRESS, her engines, boilers, tackle, etc., in rem, Timur Carriers (Pte.) Ltd. and Trans Freight Lines, Inc., her owners in personam, Defendants.

No. 81 Civ. 5280–CSH.

United States District Court,
S.D. New York.

Dec. 13, 1983.

On Motion to Reopen Case and to Amend Judgment Jan. 4, 1984.

436

Dickerson, Reilly & Mullen, New York City, for plaintiff; John H. Reilly, Jr., New York City, of counsel.

Walker & Corsa, New York City, for defendants; Hollis M. Walker, Jr., Geoffrey W. Gill, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This admiralty action arises out of an alleged collision in the North Atlantic on July 11, 1981 between plaintiff's sailing yacht OLYMPUS CAMERA and the container vessel TFL EXPRESS. Following bench trial, the Court enters the following memorandum and order which will serve as its findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

### THE PARTIES

*Plaintiff*

Plaintiff Kai Granholm is a citizen of Finland. He is a member of the Finnish Foreign Service presently posted as Counselor to the Finnish Embassy at the Hague. In July, 1981 Granholm was assigned to the Finnish Embassy at Lisbon, Portugal.

At that time Granholm owned the sailing yacht OLYMPUS CAMERA (hereinafter "CAMERA"). The CAMERA was an "Avance 36" stock design, 10.80 meters length overall, single-masted, with an auxiliary diesel engine. She was built in Finland during the spring and succeeding months of 1980. Granholm was her first (and only) owner. During construction he arranged for additional navigation and electrical equipment to be placed on board.

Granholm insured the hull and equipment of the CAMERA with Finnish marine underwriters. Following the loss of the vessel, in the circumstances to be related, Granholm received a payment from his underwriters. That prompted a suggestion by counsel for defendants at trial that, in the absence of a loan or subrogation agreement, Granholm was not the proper party to sue for recovery of amounts paid by underwriters. The issue was resolved when plaintiff's counsel represented on the record, and the Court and defendants' counsel accepted, that counsel acted for Granholm's underwriters as well as for Granholm, so that the underwriters would be bound and abide by the result of the litigation and not seek to assert a subsequent claim. The case proceeded on that understanding.

### Defendants

Defendant Timur Carriers (Pte.) Ltd. is a business entity existing under the laws of Singapore, and the owner of the TFL EXPRESS (hereinafter "EXPRESS"), an ocean-going container vessel. Her precise dimensions do not appear in the record. A photograph, Ex. 1 to the deposition of watch officer Mok, gives a general impression of the EXPRESS's characteristics, as does the photograph of a sister ship, the TFL LIBERTY, PX 3.

Defendant Trans Freight Lines, Inc. is alleged by defendants to be the time charterer of the EXPRESS, in no way responsible for her navigation.[1]

## THE CONTENTIONS OF THE PARTIES

### Plaintiff

The case for the plaintiff is that on July 8, 1981 the CAMERA departed Newport, R.I. for Portugal. Granholm was sailing her alone. This is an activity known as "single handed sailing." Granholm had indulged in single handed sailing since 1974. Enough enthusiasts pursue this activity to permit organized single handed sailing races across the North Atlantic. Indeed, the voyage from Newport to Portugal upon which Granholm was engaged at the pertinent time constituted a qualifying sail for

---

1. Defendants offered no proof with respect to intercorporate relationship. A copy of the charterparty was listed in support of defendants' proposed findings, but not offered at trial. The admission in the answer that defendant Timur Carriers (Pte.) Ltd. owned the EXPRESS is sufficient to visit upon that defendant the conse-quences of any negligent navigation of that vessel which may have harmed plaintiff. Plaintiff, whose burden it was, offered no proof of defendant Trans Freight Lines' responsibility for the navigation of the EXPRESS. The complaint against that defendant will be dismissed for that reason.

the London Observer transatlantic single handed race from Plymouth, England to Newport, scheduled later in 1981, in which Granholm intended to compete.

The first four days of the voyage passed uneventfully. Night had fallen on July 11. Granholm was on deck. The night was clear. A light wind was blowing from the west at 0–2 knots. The CAMERA was on autopilot steering a course of 90 degrees. Her main sail was rigged to port with a preventer line, and her number 1 Genoa sail was boomed out to starboard with the spinnaker pole. Her auxiliary engine was not running. The OLYMPUS CAMERA carried a tricolored lantern near the top of the mast which performed the combined functions of sidelights and sternlight. While on deck, Granholm checked the navigation equipment and all functions of the CAMERA, including the sails (which were properly set) and the navigation lights (which were burning). He scanned all around the horizon for the lights of other vessels and for any sign of deteriorating weather, stepping up on a deck winch in order to obtain greater elevation. Granholm saw no lights. The weather was clear. He had a cup of coffee in the cockpit of the CAMERA, and then went below to sleep. He did not observe the time. He set an alarm clock to ring thirty minutes later. This was not a clock which told the time. In the fashion of a kitchen egg timer, it rang an alarm at a pre-set interval.

Granholm was resting in his bunk when suddenly there was "a terrible crashing noise." The CAMERA rolled over, throwing Granholm to the deck. She then righted herself. Granholm rushed to the cockpit. He saw the stern of a large vessel just passing by. Water was coming into the CAMERA. Granholm assessed the damage. In the course of doing so he examined the mast, and observed that the tricolor lights were still burning. He made a "mayday" call on his VHF radio. Two vessels responded: a Norwegian merchant vessel and another vessel which turned out to be the EXPRESS. A white strobe light had broken loose from the CAMERA and ignited upon contacting the water. Granholm also flashed a search light towards the larger vessel he had seen just after the collision, which by this time was about two miles away, and turned on the CAMERA's deck and masthead working lights. Those on board the EXPRESS confirmed that they could see these lights, which served to identify the EXPRESS as the nearer of the two responding vessels. Granholm, in contact with the EXPRESS's master by VHF radio, asked that the EXPRESS return to assist him. The EXPRESS did so.

Time was kept on the CAMERA by Granholm's wristwatch, two chronometers, and the satellite navigator device. The chronometers showed Greenwich Mean Time ("GMT"). The wristwatch showed local time. In the collision area local time was three hours earlier than GMT. Immediately after the collision Granholm did not observe the time. The 30-minute alarm had not sounded before impact. When Granholm returned to the cabin after surveying the damage on deck, he looked at one of the chronometers. It read "about 1:30." That was GMT July 12, the equivalent of 2230 July 11 local time.

When the EXPRESS circled back and arrived alongside the CAMERA, Granholm advised her master that it did not appear that the CAMERA would sink. Granholm expressed his preference to stay on board the CAMERA, and the EXPRESS departed the scene, remaining in radio contact with the CAMERA for some time afterwards. It is right to say at this juncture that the plaintiff makes no criticism of the actions of the EXPRESS after the collision.

On the morning of July 12 Granholm turned back for Newport. He utilized the CAMERA's engine, since there was insufficient wind to sail. The CAMERA was taking water. Granholm used the electric bilge pump, and then pumped by hand after the electric pump ceased to function. He continued this course throughout July 13. The weather was deteriorating, and it became increasingly difficult for Granholm to control the level of water. On July 14 he decided that he could not keep the CAM-

ERA floating any longer. Granholm made a distress call. In the afternoon of July 14 he was picked up by the tank vessel CYS BRILLIANCE, bound for Venezuela. Granholm abandoned the CAMERA, which has never been seen again, and rode the tanker to Venezuela, returning to New York by air.

In this action, Granholm charges the EXPRESS with failing, as an overtaking, power-driven vessel, to keep out of the way of the CAMERA; with failure to make proper use of her radar; and with failure to maintain a proper lookout.[2] Granholm claims damages for loss of the CAMERA and her equipment and other property, and for personal injury.

*Defendants*

The case for the defendants is that on the night of July 11, 1981 the EXPRESS was bound on a voyage from Wilmington, North Carolina for Rotterdam. She carried less than a full deck load of containers. As the photographs reveal, the bridge, engine room and accommodations of the EXPRESS are located in the after part of the vessel.

On the night of July 11, the EXPRESS was steering a course of 056 degrees true and making good a speed of 18 knots. The wind was blowing from the northwest at force 4–5, producing a few white caps on the ocean surface. The moon was shining. There was very good visibility. Those on watch could see to the horizon. The EXPRESS was showing her navigation lights consisting of two white mast headlights, one forward and one aft, colored sidelights, and a white sternlight.

The master of the EXPRESS was Carl Jacobsen. Jacobsen, a Norwegian national, had been fifteen years at sea, sailing for seven years as an officer and one year as a master. On July 11 Jacobsen ate dinner at 1800 hours local time. After dinner he attended to paper work, and then played cards with the chief engineer in the latter's cabin for two hours, from 2000 hours to 2200 hours. Jacobsen looked at his watch when he left the chief engineer's cabin; it read 10:00 (that is, 2200 hours). It was Jacobsen's habit to go to the bridge every night before retiring. Accordingly he proceeded to the bridge from the chief engineer's cabin, arriving there at about 2203 hours. The deck officer of the watch during the 2000–2400 watch was third officer Mok Sien Kang. The other member of the deck watch was ordinary seaman Abu Bakar Bin Jaafar. Both these individuals had received their maritime education and training in Singapore. When Jacobsen reached the bridge at about 2203, third officer Mok was the only individual there. He was in the chart room.

Mok was alone on the bridge of the EXPRESS because, at about 2158 or 2159 hours, he had asked Bakar if there was any other traffic around. Bakar was acting as lookout. The EXPRESS was on automatic pilot. Bakar stood his watch as lookout on the wings of the bridge, crossing on occasion from the starboard wing to the port wing and back again. Bakar looked around the horizon, and told Mok that there was no other traffic visible. Mok thereupon sent Bakar down below to get tea. Mok made a visual check around the horizon, observed no lights of other vessels, and at 2200 hours went into the chart room to obtain the EXPRESS's position at that hour from the satellite navigation device. Mok was thus engaged when Jacobsen arrived on the bridge shortly after 2200.

Jacobsen went to the starboard wing. He looked forward and saw nothing. He then looked astern of the EXPRESS, and observed a blinking white light at an estimated distance of about two miles. Jacobsen asked Mok if the latter had observed such a light. Mok answered in the nega-

---

**2.** The pleadings raised an issue with respect to the adequacy of training and licensing of the EXPRESS's watch officer. The deposition of Captain Short, at the Department of Nautical Studies, Singapore Polytechnic, addresses that issue. Plaintiff did not pursue the issue at trial or in summation. There was no basis to find that the watch officer was professionally unqualified.

tive. Both officers regarded the blinking white light through their binoculars. No other lights were visible. Jacobsen and Mok then heard a "mayday" call coming over the VHF radio. The distress call stated in substance: "I have been hit—collided—taking in water—need assistance." No position was given in the distress call, but the individual initiating it stated that he would turn on his deck lights: "maybe you can see me." As Jacobsen and Mok kept the blinking white light under observation, they saw additional white lights come on, near the blinking light. While another vessel had also responded to the mayday call, this display convinced Jacobsen that the EXPRESS was the closest vessel. At the time the additional white lights came on, the EXPRESS (which had continued on her course of 056 degrees true) was about four miles distant. Jacobsen recalled Bakar to the bridge to act as helmsman. The EXPRESS was placed on hand steering. Jacobsen altered course to starboard, and the EXPRESS headed back towards the CAMERA. Granholm had identified himself and his vessel in the continuing VHF exchange. Jacobsen reduced the speed of the EXPRESS's engine by various hand ,maneuvers on the bridge. The EXPRESS had direct bridge to engine room controls. These orders were not logged. As the EXPRESS approached the CAMERA, Jacobsen ordered the EXPRESS's engines stopped. That order is recorded in the engine room log, DX C, at 2230 hours.

The EXPRESS was equipped with two radar sets. One radar screen was in the wheelhouse, and the other in the chart room. On the evening in question the wheelhouse radar was on "standby." That means the radar was warmed up, but not operating. It is necessary to turn the radar fully on before getting a picture. With the radar on standby, the picture appears almost at once.[3] The chart room radar was

switched off. Jacobsen's policy was to leave use of the radar to the watch officer's discretion, except when the EXPRESS navigated in confined waters or poor visibility, in which events the radar was always on. At the pertinent time the EXPRESS was proceeding in the open ocean on a clear night. Keeping the radar on standby in those circumstances was consistent with policy.

After being contacted by the CAMERA on radio, Jacobsen switched on the wheelhouse radar. He never picked up the yacht as a target. However, Mok was able to observe the CAMERA on the radar screen as the EXPRESS steamed away after resuming her course.

Jacobsen testified that, as he approached and circled the CAMERA, he did not observe any colored navigation lights or a white stern light. He did observe white deck lights, and bright "spreader" lights on the mast. These lights are used to illuminate the deck area for work purposes. They are among the lights which Granholm turned on in order to facilitate the location of his vessel by rescuers.

There is no dispute between the parties as to the further exchange between Granholm and Jacobsen, and the circumstances under which the EXPRESS left the scene. At Granholm's request, Jacobsen sent messages concerning the CAMERA's situation to the United States Coast Guard and to her underwriters. The message to the Coast Guard, DX B, was handed in to the EXPRESS's radio operator at "0350Z" on July 12 and transmitted at "0403Z." The "Z" is an abbreviation for "Zulu," which in turn means Greenwich Mean Time. Thus these times are 0050 and 0103 local time on July 12 respectively. The message to the Coast Guard reads as follows:

"SINGLE MAN SAILBOAT OLYMPUS CAMERA/OF3080 POSN 0125Z JULY/12TH 4042N 6122W COURSE 270

---

**3.** The status of a radar on "standby" was described in *British Transport Commission v. United States,* 230 F.2d 139, 142 (4th Cir.1956), *aff'd,* 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234 (1957):

"At stand by, no images are visible on the radar screen, but the radar is kept heated and, as the pilot testified, 'When you do switch it, it comes on immediately.'"

BOUND FOR NEWPORT R.I. STOP DAMAGED HULL FROM COLLISION WITH MERCHANT VESSEL TFL EXPRESS/9VPU PROCEEDING NEWPORT UNDER OWN ASSISTANCE STOP EXPECT TO ARRIVE IN 5DAYS PLS NOTIFY ROYAL WESTERN YACHT CLUB OBSERVERS OFFICE TEL. NEWPORT R.I. 8494761

KAI GRANHOLM"

Jacobsen also sent a radio message to his vessel's Rotterdam agents. That cable, PX 6, reads in full:

"On July/12TH 0125GMT POSN 4042N 6122W COLLIDED WITH SINGLE MAN SAILBOAT OLYMPUS CAMERA/OF 3080 FINNISH REGISTRY BOUND FOR NEWPORT RHODE ISLAND DAMAGE TO SAILBOAT 2FEET CRACK ON STARBOARD QUARTER ABOVE WATERLINE FIBERGLAS MATERIAL. NO DAMAGE TO OWN VESSEL. SAILBOAT DID NOT SHOW ANY LIGHTS BEFORE COLLISION AND OCCUPANT ASLEEP SAILBOAT DECLINED ASSISTANCE AND PROCEEDS NEWPORT UNDER OWN SAILS AND ENGINE SAILBOAT INSURED WITH SCANDINAVIAN CLAIM OFFICE NEWYORK TEL. 212 2698244 NAME OF OCCUPANT MR. KAI GRANHOLM DELAY TO OWN VESSEL APPROX 3HOURS.

JACOBSEN"

This radio message was handed in on July 12 at 0515Z (0215 local time) and transmitted at 0540Z (0240 local time).

Defendants charge Granholm and the CAMERA with failing to maintain a proper lookout, failing to show the requisite navigation lights, and failing to take steps to avoid collision.

---

**4.** The Convention on the International Regulations for Preventing Collisions at Sea, 1972, entered into force in the United States on July 15, 1977. 33 U.S.C. foll. § 1602 (hereinafter the "Rules"). Rule 5 provides:

## DISCUSSION

I preface my discussion of the parties' several allegations of fault by resolving three particular issues of fact.

*The Fact of the Collision*

■ In their pre-trial submissions defendants questioned whether the EXPRESS had in fact collided with the CAMERA. Counsel did not formally abandon the issue during summation, but it is not pressed; and the evidence adduced by both parties, which I need not restate, clearly demonstrates that the EXPRESS struck the CAMERA.

*The Time of the Collision*

■ This is a hotly disputed issue, because of its interrelation with the conceded failure of the EXPRESS, during one particular interval on the night of July 11/12, to maintain a proper lookout.

On defendants' own evidence, shortly before 2200 watch officer Mok sent seaman Bakar, who had been acting as lookout, below to get tea. Mok then went into the chartroom to fix the 2200 position. Thus the EXPRESS was left entirely without a lookout. Indeed, even if Mok had remained on the bridge the EXPRESS would have been deficient in this respect, it being well settled that a proper lookout must have no other duties. Defendants' counsel conceded in summation, with commendable candor, that the EXPRESS was in violation of Rule 5[4] from the time Bakar left the bridge until he was summoned back, after Jacobsen observed the CAMERA's lights astern.

The question therefore arises whether the collision occurred during the interval when Bakar was away from the bridge. Plaintiff says that it did. Defendants say it did not.

Plaintiff contends that the collision occurred at about 2225 local time. He relies

"Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."

upon the radio message Jacobsen sent to defendants' Rotterdam agent, PX 6. I quoted the full text *supra*. That message commences:

"On July/12th 0125GMT POSN 4042N 6122W COLLIDED WITH SINGLE MAN SAIL BOAT OLYMPUS CAMERA..."

Plaintiff interprets that message to mean that the collision occurred at 0125 GMT, the equivalent of 2225 local time. Accepting defendants' evidence on the point, Bakar had gone below just before 2200. He could not say when he returned to the bridge. From this plaintiff invites me to draw the inference that the collision occurred while Bakar was below, and the EXPRESS accordingly deficient in her lookout.

Plaintiff finds corroboration of this collision time in the EXPRESS's course recorder tape, PX 11. The course recorder is a device with a moving pen which constantly traces the vessel's heading in degrees. The time of day appears on the margin of the tape. Course recorder tapes can furnish evidence of dramatic clarity when the course recorder clock is synchronized with the ship's clock. When these clocks are not synchronized, uncertainty intrudes. This case furnishes an illustration.

The course recorder tape of the EXPRESS shows a sweeping turn to the right beginning at 1710 hours course recorder time. I accept that this is the right turn Jacobsen ordered after observing the CAMERA's lights astern. Neither party suggests otherwise. But it necessarily follows that the course recorder clock was not synchronized with the ship's clock. 1710 hours for commencement of the turn to the right does not square with either party's version of the events, whether we are speaking in local time or GMT.

On July 20, 1981, her voyage having been completed, the EXPRESS was boarded at Felixstowe, England by two solicitors retained by her owners to investigate the incident. Jacobsen signed a 13-page statement written in the hand of one of the solicitors. At trial plaintiff's counsel confronted Jacobsen with the following passage in that statement:

"With regard to the ship's course recorder for the 11th July it has been pointed out that the course alterations when we returned to the OLYMPUS CAMERA are timed at 1710. The course recorder should record GMT and it is therefore roughly 8½ hours behind."

Plaintiff points out that the addition of 8 hours and 30 minutes to the course recorder time of 1710 results in the time of 0140 GMT. Commencement of the turn at 0140 GMT is consistent with collision at about 0125 GMT. The interval is 15 minutes. Jacobsen estimated that when the EXPRESS commenced her turn to the right, the CAMERA was about four miles astern. At a speed of 18 knots, the EXPRESS would travel four miles in just over 13 minutes.

Finally, plaintiff testified that at about ten minutes after the collision he observed the CAMERA's chronometer, which read "about 0130."

Defendants place the collision at shortly before 2200 local time. They rely in the first instance upon the evidence of Captain Jacobsen. He testified that he arrived on the bridge at 2203, and almost immediately observed the CAMERA's white light about two miles astern. Timing that observation at, say, 2204, and recognizing that at a speed of 18 knots it would take the EXPRESS just over six and one-half minutes to travel two miles, a collision time of about 2257½ results. This has for the EXPRESS the convenience of being just before the time when Mok and Bakar testified that the latter went below.

Defendants also rely upon the entry in the engine log book that the engines were stopped at 2230 local time. He stopped the EXPRESS's engines, Jacobsen testified, when his vessel was only about 50–100 meters from the CAMERA. 2230 hours local time is the equivalent of 0130 GMT. The EXPRESS had to travel four miles to get back to the CAMERA. Jacobsen testified that he was gradually reducing speed as the EXPRESS turned and made her way

back. This account is consistent with a collision time somewhat prior to 2200.

Defendants also rely upon the course recorder tape. As noted, the EXPRESS's turn to the right began· at 1710 course recorder time. The vessel's course for Rotterdam, 056 degrees, was resumed at 1825 course recorder time. This interval is 75 minutes. According to the deck log, the eastbound voyage resumed at 2325. 2325 less 75 minutes results in the turn to the right having commenced at 2210 ship's time. When the turn commenced, the CAMERA was four miles astern, a distance which as noted the EXPRESS would require 13 minutes to travel at a speed of 18 knots. A collision time of 2157 results from these calculations.

Defendants also rely upon entries in the deck log that at 2215 the vessel was turned around to assist, and at 2240 arrived "approximately 100 feet from the sailboat."

Clearly the parties' calculations of collision time cannot be reconciled. Defendants attack the bases for the plaintiff's calculations. As for the radio message Jacobsen sent to his agents, he testified that the time "0125 GMT" was not intended to indicate the time of collision. Rather, it indicated the time at which the EXPRESS was at the coordinates 40–25N and 61–22W, the position where the EXPRESS found the CAMERA after returning to the yacht.

Jacobsen explains his statement to defendants' solicitors at Felixstowe about an 8 and ½ hours discrepancy between course recorder time and ship. time as the result of a misunderstanding. Jacobsen testified that he had been without sleep for a number of days, and did not fully appreciate what the solicitors were saying to him on the point.

Plaintiff, for his part, charges the EXPRESS witnesses with perjury and wholesale falsification of the logs. He must do so. I can reject the defendants' calculation of collision time only if I conclude that Jacobsen swore falsely concerning the time of his return to the bridge and the events immediately following; that Mok swore

falsely on the same subjects; and that the quoted entries in the engine and deck logs are fabricated. Plaintiff's argument has to be that, in the midst of spinning this web of lies, Jacobsen inadvertently gave the game away by the radio message to his agents giving a collision time of 0125 GMT.

I cannot accept plaintiff's submission on this point. Watch officer Mok testified by deposition, and so I could not observe his demeanor. But Captain Jacobsen appeared before me. He testified at length on direct and cross-examination. He impressed me as candid, straightforward and truthful. I do not believe that in the early morning hours of July 12, 1981 he orchestrated a series of false entries, at the same time suborning perjury in his watch officer and chief engineer. I do not believe Captain Jacobsen lied to me on the stand.

I reach this conclusion, although I appreciate the force of plaintiff's argument concerning the deck and engine logs. The reference to the engine being stopped at 2230 in the engine log appears as a "remark" appended below contemporaneous notations. The deck log entries describing the events in suit appear in a separate document referred to as the "official log," composed particularly for the purpose of describing them. In consequence, these documents lack the chronological spontaneity of, say, an engine room bell book. It is recognized that an engine bell book, in which orders received from the bridge are immediately entered by engine room personnel with no knowledge of what is happening above decks, have a particular trustworthiness. The EXPRESS did not maintain such a document. But I adhere to my refusal to reject the defendants' evidence on the point as fabricated.

Plausible explanations exist for the perceived discrepancies upon which plaintiff relies. I accept Jacobsen's testimony that the time reference in his radio message to the agents refers to the time at which the EXPRESS arrived alongside the CAMERA, at the position 40–42N and 61–22W. The radio message lends itself to either interpretation. I accept Jacobsen's testimony

because, as noted, I found him to be a credible witness. But my finding on the point is also influenced by the radio message Jacobsen sent to the Coast Guard at Granholm's request. That is, DX B in evidence, which I have also quoted in full. Granholm described the circumstances in which that message was sent. He testified on cross-examination:

Q. After the Express came alongside your sailboat, did you dictate messages that you requested the master to send on the radio?

A. No, sir. I didn't dictate any messages, but I asked him to send two messages that was already when they had left, a little later. I asked him to send one cable to the U.S. Coast Guard and one cable to the Scandinavian marine claims office.

Q. Did you give him the context [sic] of the message that you wished sent?

A. I told him to inform the coast guard of the accident, to tell the coast guard that I tried to sail back to Newport and that I didn't need immediate assistance, but I didn't dictate the message. Then some minutes later the master came back on radio and he read a message that he was about to send to the coast guard and asked for my approval of the text.

Q. Did the text that he read back to you include all of the information that you wished included?

A. Yes, sir. Tr. 63–64.

The radio message Jacobsen sent to the Coast Guard begins: "SINGLE MAN SAILBOAT OLYMPUS CAMERA/OF3080 POSN 0125Z JULY/12TH 4042N 6122W COURSE 270 BOUND FOR NEWPORT R.I. STOP DAMAGED HULL FROM COLLISION WITH MERCHANT VESSEL TFL EXPRESS..." As has been noted, the "Z" after the time 0125 means Greenwich Mean Time.

There is no ambiguity about this radio message. Jacobsen sent it to the Coast Guard at Granholm's request to alert the Coast Guard of the position and condition of the CAMERA following the collision. It is clear that the time "0125Z" refers to the position which is stated immediately thereafter. That position was calculated by the EXPRESS's officers after the EXPRESS had returned to the CAMERA. Jacobsen sent the message in response to a conversation he had with Granholm at that time. In short, this radio message resolves any ambiguity in the message Jacobsen subsequently sent to his agents. The 0125 GMT time (2225 local time) is not the time of the collision.

As for Jacobsen's statement to his owners' solicitors at Felixstowe about course recorder time, I accept as plausible his testimony that there was a failure of communication. The EXPRESS had been sailing in congested waters. I accept Jacobsen's testimony that he had gone short on sleep for the previous two days. The solicitors boarded the vessel, one may reasonably infer, fully rested and full of inquiry. I have been a member of comparable boarding parties. The statement is in the handwriting of one of the solicitors, not that of Jacobsen. Accordingly it reflects to some degree the working of the solicitor's mind. This is significant because at the time of boarding the solicitor's main source of information was undoubtedly the radio message sent by Jacobsen to the Rotterdam agents. That message could be read, as I have said, to give the collision time as 0125 GMT. If the solicitors so interpreted the message, they boarded the EXPRESS on July 20 with that preconception. Their examination of the course recorder tape would then lead them to the conclusion that there was a discrepancy of about 8 and ½ hours between course recorder time and ship time.

I do not know if this is what happened. The solicitors did not testify. Jacobsen said he could not understand or explain the reference to an 8 and ½ hours discrepancy. The suggested explanation seems plausible enough. But I do not rely on it. I am simply not persuaded by the EXPRESS's

course recorder tape that her witnesses lied under oath and her logs were fabricated.[5]

I am mindful of Granholm's testimony that, no later than ten minutes after the collision, he observed the time 0130 GMT on the CAMERA's chronometer. I cannot accept that evidence. That is not because I consider Granholm unworthy of belief. I simply have no confidence in his recollection on the point. The circumstances were highly unsettling. Granholm had been roused from sleep by the collision impact. He had reason to fear the CAMERA was sinking. He surveyed the damage and then broadcast his mayday distress call. That led to Granholm's radio colloquy with Jacobsen on the EXPRESS, the latter vessel's return to assist him, and the messages sent by Jacobsen at Granholm's behest to which I have previously referred. I do not doubt that at some time during these crowded and distracting events Granholm looked at the CAMERA's chronometer and read the time 0130. But I conclude that this occurred considerably later than ten minutes after the collision.

On all the evidence, I find that the collision between the EXPRESS and the CAMERA occurred shortly before 2200 local time on July 11, 1981.

*The Lights Being Shown by the CAMERA*

Defendants ascribe the collision to the CAMERA's failure to exhibit the required navigation lights. The contention is based upon the failure of anyone on board the EXPRESS to observe lights on the CAMERA prior to collision, and the testimony of Captain Jacobsen and watch officer Mok that after the collision they observed only white lights on the CAMERA, and not colored lights.

Granholm has testified that the navigation lights were properly set and burning when he went below to rest just before the collision, and that the navigation lights were still burning when he came on deck

after the collision to inspect the CAMERA's condition.

The lights which the CAMERA was obligated to show are specified in Rules 21, 22 and 25. Rule 25 provides in pertinent part:

"(a) A sailing vessel underway shall exhibit: (i) sidelights; (ii) A sternlight. "(b) In a sailing vessel of less than 12 metres in length the lights prescribed in paragraph (a) of this Rule may be combined in one lantern carried at or near the top of the mast where it can best be seen."

Rule 25(b) applies to this case because the CAMERA was less than 12 metres in length.

The "sidelights" which Rule 25(a)(i) obligates a sailing vessel underway to exhibit are defined by Rule 21(b):

" 'Sidelights' means a green light on the starboard side and a red light on the port side each showing an unbroken light over an arc of the horizon of 112.5 degrees and so fixed as to show the light from right ahead to 22.5 degrees abaft the beam on its respective side."

The "sternlight" required by Rule 25(a)(ii) is defined by Rule 21(c):

" 'Sternlight' means a white light placed as nearly as practicable at the stern showing an unbroken light over an arch of the horizon of 135 degrees and so fixed as to show the light 67.5 degrees from right aft on each side of the vessel."

Rule 22(c) requires that, in vessels of less than 12 metres in length, the sidelight be visible at a minimum range of one mile, and the sternlight at a minimum range of two miles.

■ Granholm, seeking to cast the defendants in damages for the collision, has the burden of proving that his vessel carried proper lights. *Griffin on Collision* (1949) at 234. In sustaining that burden, Granholm has the benefit of a line of au-

5. As I have observed, if Jacobsen really was concocting a false story he let the cat out of the bag with his radio message to the Rotterdam agent. I cannot believe that he would be so foolish. If the deck and engine logs had been written up falsely before the message was sent, the message could also have easily been made to show a false time. If the message had preceded the log entries, the falsity of the latter was transparent and unlikely to be hazarded.

thority summarized by Griffin thus: "While each case must, of course, be decided on its own evidence, it is often stated that affirmative testimony that lights were displayed is given greater weight than negative testimony that they were not." *Id.* at 234–35 (citing cases). The Second Circuit articulated this principle in *The Buenos Aires,* 5 F.2d 425, 430 (2d Cir.1924). A more recent declaration may be found in *Sun Oil Co. v. S.S. Georgel,* 245 F.Supp. 537, 546 (S.D.N.Y.1965), *aff'd,* 369 F.2d 406 (2d Cir.1966).

 To be sure, Griffin prefaces the rule with the caveat that "each case must be decided on its own evidence." That leads *inter alia* to a consideration of credibility. If I concluded that Granholm was unworthy of belief, I would reject his testimony concerning the lights which the CAMERA was displaying. But I do not reach that conclusion, although urged by defendants' counsel to do so. Granholm impressed me as a precise, fastidious individual, well aware of the hazards inherent in a single-handed sail across the North Atlantic. He had equipped the CAMERA with a considerable amount of optional electronic navigation and safety equipment. I shall deal with that subject further when I come to discuss damages. The point here is that the manner in which Granholm equipped the CAMERA was consistent with a well-developed concern for safety.

I also accept Granholm's testimony concerning his practice in resting during such a voyage. He testified:

Q. When sailing alone, Mr. Granholm, would you tell the court the routine which you observed?

A. Yes, sir. There is not very much of a routine when you sail alone. It all depends on the weather conditions, on the traffic, but as a rule I made it a habit to take my resting periods during daytime and when the conditions were such that I could afford having some rest. I never rested more than 30 minutes. That was the routine that I had. I set the alarm clock to ring at maximum 30 minutes. Often it was much less, maybe 15 minutes. So during nighttime I mostly stayed awake. That means to do navigation, change sails, everything that is to be done on a boat.

Q. Is it correct, sir, that you would not on a voyage ever have more than 30 minutes of straight sleep?

A. Yes, sir. Tr. 19–20.

I will deal *infra* with the prudence of Granholm's going below during the night in question. For present purposes, this testimony reflects Granholm's awareness—essentially a matter of commonsense—that when navigating alone it is preferable to rest during the day time, when other vessels may better see a sailboat, rather than at night.

Given my impression of the plaintiff and these particular circumstances, I conclude that for Granholm to have retired to the cabin with no navigation lights burning on the CAMERA, would have been an act of folly so extreme that, based on my observations of the plaintiff, it becomes highly unlikely. I agree with Judge Waddill's observation in *The Richmond,* 114 Fed.Rep. 208, 212 (E.D.Va.1902):

"The court should be slow to hold that the officers and crew of a vessel were navigating the same without lights, as by so doing they were imperiling, not only the ship and its cargo, but their own lives."

I do not believe Granholm followed so foolhardy a course on the night of the collision in suit.

Defendants' negative evidence that the CAMERA was not showing the proper lights consists of the deposition testimony of Mok and Bakar that they observed no lights before the collision, and the testimony of Jacobsen and Mok that they only observed white lights, and not green or red sidelights, on the CAMERA after the collision.

Having in mind the vessels' respective courses when the EXPRESS was overtaking the CAMERA, only the CAMERA's white sternlight would have been visible to the EXPRESS. In consequence, the fact

that the EXPRESS's witnesses did not observe colored lights prior to collision proves nothing. As for post-collision events, when the EXPRESS returned to the CAMERA Granholm had turned on all the white lights the CAMERA possessed, including "spreader" lights which are positioned on the mast and illuminate the deck for working purposes. Jacobsen acknowledged that this profusion of white lights might serve to mask or overpower the colored components of that single tricolored lantern which the CAMERA was permitted by the rules to display. There are, in other words, plausible explanations for the failure of the EXPRESS witnesses to see colored lights on the CAMERA.

Of course, this analysis does not apply to the CAMERA's white sternlight. Those on board the EXPRESS should have seen that light before the collision. But their failure to do so does not under settled authority require a finding that the light was not lit. Failure to observe the light may also be ascribed to failure to maintain a proper lookout.

I find on the evidence in this case that the CAMERA was displaying the navigation lights called for by the rules at the time of the collision.

*Fault on the Part of the Express*

■ Given the finding that the CAMERA was displaying proper navigation lights, the fault of the EXPRESS logically follows. Defendants offered evidence, which I accept, that had the CAMERA been displaying no lights, she could not have been seen by those on board the EXPRESS in sufficient time to avoid collision, given the characteristics of the latter vessel. But I have found that the CAMERA was displaying the lights required by the rules; and there is no suggestion that the EXPRESS could not have fulfilled her obligation of avoiding the CAMERA if the CAMERA was displaying a proper sternlight which the EXPRESS's lookout had timely observed. In these circumstances, the EXPRESS must be held in fault. Griffin, *op. cit. supra* at 281, summarizes the case law:

"That the lookout must exercise steady vigilance is obvious. If he fails to see lights or vessels which proper watchfulness would have disclosed, that fact 'unexplained, is conclusive evidence of a defective lookout', *The New York*, 175 U.S. 187, 204 [20 S.Ct. 67, 73, 44 L.Ed. 126] (1899), and his vessel is in fault."

I accept defendants' contention that lookout Bakar had not quite gone down for tea before the collision occurred. But the EXPRESS must be condemned for his failure to observe and report a light which he should have seen.

Plaintiff also contends that the EXPRESS should be held in fault for failure to post the lookout on the bow rather than on the wings of the bridge; and for failure to have the radar in full operation at all times. I am not persuaded by either of these contentions.

■ Rule 5 requires the maintenance of "a proper lookout"; his positioning on the vessel is not specifically addressed. There is authority in the earlier cases for the proposition that a lookout should be posted in the bow, "especially if the visibility is poor," *United States v. The Adrastus*, 190 F.2d 883, 886 (2d Cir.1951). But the rule is not hard and fast. The Second Circuit has approved the posting of a lookout in the wheel house, at least in respect of tugs, *Moran Towing & Transportation Co. Inc. v. The City of New York*, 620 F.2d 356, 357 n. 1 (1980), having accepted testimony "that the lookout's station in the wheel house provided the best view and allowed the lookout to communicate easily with the mate." In the case at bar, defendants' expert witness Warren Harday, who has sailed as master on container ships such as the EXPRESS, testified that in clear visibility it is the practice on such vessels to post the lookout on the wings of the bridge rather than on the bow. The bow is obscured from the bridge by containers stowed on deck. In consequence the watch officer on the bridge cannot observe the lookout on the bow to ensure his attentiveness, or that he has not been injured by sudden swells. A lookout stationed on the

bridge wing may be more closely supervised. He is also able to report immediately to the watch officer. Captain Jacobsen gave comparable testimony. Plaintiff offered no contrary expert evidence. While I recognize that in some circumstances evidence of a practice is nothing more than evidence of a negligent practice, I conclude in this case that a container ship with her bridge located aft and the bow obscured by containers, proceeding in uncongested waters on a clear night, does not violate Rule 5 by posting a lookout on the bridge wings rather than on the bow.

■ I also reject plaintiff's contention that the EXPRESS must be condemned for failing to have her radar switched on during the evening in question. To reiterate: the EXPRESS was sailing in the open ocean on a clear night. Plaintiff cites no case requiring use of radar in such circumstances. My own research discloses none. The Fourth Circuit reached a contrary conclusion in *British Transport Commission v. United States, supra.* The district judge in that case rejected a contention that failure to use radar on a clear night constituted fault because it would have revealed the other vessel's existence. The district judge wrote:

"But [the mate] was not looking for anything to starboard; he had no reason to go to the radar to search in any direction. His failure to see the Duke [the other vessel] was not negligence, for it was not the result of neglect of an obligation. No obscurity obligated him to use his radar, and there was nothing else to put him on notice of any need for it."

The Fourth Circuit quoted this language with approval. 230 F.2d at 142.

■ In *Afran Transport Co. v. The Bergechief,* 274 F.2d 469, 474 (2d Cir.1960), Judge Medina stated generally: "If a vessel carries properly functioning radar equipment and she is in or approaching an area of known poor visibility, there is an affirmative duty to use the radar." *British Transport Commission v. United States* is one of the cases cited for that proposition in *Afran Transport.* It seems fair to assume that the Second Circuit would not condemn a vessel for failing to use her radar in uncongested waters and clear visibility. Certainly the Second Circuit has never done so. Plaintiff relies upon Rule 7(b), which specifies that "[p]roper use shall be made of radar equipment if fitted and operational," [6] but this rule, enacted as part of a revision of the rules preventing collisions in 1977, does not in my view change the result. Propriety does not require use of the radar in circumstances such as these. Indeed, it may be imprudent to run the radar at all times. I may judicially notice, Fed.Rule of Evid. 201(b), that the service lives of radar sets (like all appliances) are finite. Indiscriminate use may cause the radar to fail when it is most needed.

In short, I conclude that absent circumstances indicating that radar may give information useful for safe navigation and not otherwise available, there is no obligation to keep the radar fully activated. Keeping the radar on standby while underway is, of course, a prudent procedure.

While I reject plaintiff's claims that the EXPRESS should be held in fault for positioning of the lookout and failure to use radar, the EXPRESS must nonetheless be condemned for failure to maintain a proper and attentive lookout.

### Fault on the Part of the CAMERA

As noted, I have rejected defendants' claim that the CAMERA failed to display the required navigation lights. But she must also be condemned for failure to maintain a proper lookout.

---

**6.** Rule 7 provides in part:

"(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

"(b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects."

The obligation to maintain a proper lookout falls upon great vessels and small alike. *Matter of Interstate Towing Co.,* 717 F.2d 752 (2d Cir.1983) (failure of "small pleasure craft" to maintain proper lookout held to contribute to her collision with barge under tow).

In the case at bar, Granholm's decision to go below during the nighttime was negligent. His own testimony reflects an awareness that this was so. I have previously quoted the relevant portion; Granholm said that "as a rule I made it a habit to take my resting periods during daytime and when the conditions were such that I could afford having some rest." The reasons are obvious. At night a sailboat, even displaying the proper lights, is not nearly as visible as she is in the daytime, when underway under sail. Granholm was sailing near a recognized transatlantic route for large vessels. He should have adhered to his own practice and rested only during the daytime. It may seem unfeeling to condemn single handed transatlantic sailors for sleeping at night. But they pursue this hazardous avocation voluntarily, and are not exempt from the requirements of prudent seamanship.

The charge against plaintiff of improper lookout does not depend solely upon his decision to go below. Accepting as I do his testimony that the impact occurred less than thirty minutes after Granholm went below, his failure to observe the lights of the oncoming EXPRESS is inexplicable and inexcusable. Defendants' expert witness Hardy testified, and I accept, that on a clear night the navigation lights of the EXPRESS should have been visible up to fourteen miles away. We may reduce that distance to ten miles; even then, at the EXPRESS's speed of eighteen knots her lights would have been visible to Granholm for 33 minutes prior to collision, assuming the CAMERA was making no headway at all. The EXPRESS's lights should have been visible to Granholm before he went below. And Granholm was obligated in the circumstances to occasionally scan around the horizon, including astern, an obligation he recognized by doing so before going below. Cf. *Stevens v. United States Lines Co.,* 187 F.2d 670, 674–75 (1st Cir.1951).

Plaintiff's failure to observe the lights of the approaching EXPRESS before collision places him in an inescapable dilemma. If, as his own testimony would indicate, the lights of the EXPRESS were visible when Granholm went below, he is at fault for not having seen them. But assuming that Granholm went below before the EXPRESS's lights became visible (so that he was asleep for a greater period of time before impact than his testimony would suggest), the fact remains that he left his vessel entirely without a lookout in circumstances which rendered such action negligent. There is no question but that plaintiff could and should have taken evasive action if he had observed the approaching EXPRESS.

*Division of Fault*

Since *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), liability for damage in marine collision cases is allocated among the parties proportionately to the comparative degree of their fault. Thus I have the full mathematical sliding scale available to me. But I conclude that there is no basis to distinguish between the faults of the EXPRESS and the CAMERA. The CAMERA's failure to maintain an attentive lookout rises to the level of that of the EXPRESS; indeed, the failure to maintain any lookout at all at night constitutes a more severe degree of neglect. That is sufficient to overcome any advantage which the CAMERA might otherwise enjoy as (1) an overtaken vessel which (2) was under sail.[7] The CAMERA's basic lookout deficiency condemns her to an equal pro-

---

7. Rule 13(a) provides:
 "(a) Notwithstanding anything contained in the Rules of this Section any vessel overtaking any other shall keep out of the way of the vessel being overtaken."

Rule 18(a)(iv) requires "a power-driven vessel underway" to "keep out of the way of ... [a] sailing vessel."

portion of the fault for the collision. Cf. *Matter of Interstate Towing Co., supra*, at 757 (district court's allocation of 20 percent fault to small pleasure craft for failure to maintain lookout reversed as insufficient share of blame for ensuing collision with tug and tow).

It follows that plaintiff will recover one-half of its provable damages, a subject to which I now turn.

*Plaintiff's Claim for Property Damage*

Plaintiff's claim for property loss is comprised of three main categories: (a) value of the CAMERA's basic hull; (b) value of extra electronic and other equipment with which she was fitted; and (c) value of personal items lost with the vessel.

Plaintiff testified concerning the nature and value of all items that were on the CAMERA. An expert witness qualified in yacht valuation, Gerald T. LaMarque, testified as to certain aspects of the property damage claim. The categories of property damage claim are considered in turn.

(a) *Basic Hull of the CAMERA*

■ LaMarque valued the CAMERA's basic hull and equipment, exclusive of extra electronic equipment and personal effects, at $93,700. Defendants do not dispute that figure. The item is allowed.

(b) *Extra Navigation and Electronic Equipment*

■ Plaintiff testified that following the collision he prepared a list of extra electronic, navigational and related equipment which he had installed on the CAMERA. The list, PX 7, contains values expressed in Finnish marks (hereinafter "FMK"). It is dated at Lisbon October 19, 1981. Granholm prepared this list with the assistance of a representative of his hull underwriters.

There is no evidence from which I could find that plaintiff had not in fact had this equipment installed on the CAMERA.

Plaintiff took certain of the items on this list off the CAMERA when he boarded the CYS BRILLIANCE and abandoned the CAMERA. Those salvaged items are described in the answer to defendants' interrogatory 51. Their total value is FMK 20,530. The total valuation listed on PX 7 is FMK 220,815. Deduction of the FMK 20,530 figure gives a net amount of FMK 200,285. The parties agree on a conversion rate of 4.325 Finnish marks to the dollar. Thus FMK 200,285 is the equivalent of $46,308.67.

Defendants, in their post-trial brief on damages, contend that an additional deduction of FMK 25,000 should be made from this list, PX 7. That is a reference to the first item on the list which refers to sails which were lost on board the CAMERA. Defendants point out that in the answer to interrogatory 51, there is a reference to "5 sails" which were salvaged from the CAMERA. They theorize that these five sails comprised the CAMERA's total complement of sails, so that there should be no claim for lost sails on PX 7. Plaintiff's brief responds that the proper interpretation of the evidence is that Granholm was able to include only certain sails among other equipment, as he boarded the BRILLIANCE in some haste. This seems to me the more reasonable interpretation of the evidence. I will not make a further deduction from the claim in respect of salvaged property.

LaMarque valued the lost equipment at $46,699. On most items, he simply accepted Granholm's valuation in Finnish marks as it appeared on PX 7, performing the mathematical function of converting the Finnish marks into dollars. On "a half dozen items or so," LaMarque checked against list prices in the United States. LaMarque ran these independent checks on "some of the larger items," i.e., the more costly ones. Tr. 108. If U.S. prices were "close to what the Finnish mark conversion figure was," he left the valuation as is. If not, he put down a different valuation in dollars. Tr. 110. Presumably this exercise accounts for the relatively slight discrepancy between $46,308.67 (based entirely upon Finnish marks) and the figure of $46,699 testified to by LaMarque.

Although defendants challenge this item of claim as insufficiently proved, I will allow the claim for lost equipment in the amount of $46,699. I recognize that on this aspect of the claim, LaMarque's expert opinion testimony is of limited probative value. That is because, in respect of most of the items, he accepted Granholm's valuation and made no independent check. But Granholm, as the owner of this equipment, was competent to testify concerning its value. "Ordinarily an owner of personal property who is familiar with its quality and condition is credited with having some knowledge of its value and may testify to that. . . . He need not prove that he is an expert qualified to speak on the subject." *Caten v. Salt City Movers & Storage Co.,* 149 F.2d 428, 433 (2d Cir.1945). And LaMarque's confirmation of at least some of the items, in an area where his expertise qualified him to testify, tends to corroborate the reasonableness of Granholm's valuations. Defendants, armed well in advance with this itemized list as the result of pre-trial discovery, called no expert to testify that the valuations claimed were outlandish or excessive. Defendants' counsel attempted no item-by-item cross examination of Granholm. On this aspect of plaintiff's claim, I conclude that he has furnished "reasonable data from which the amount of damages can be ascertained with reasonable certainty," *Compania Pelineon de Navegacion v. Texas Petroleum Company,* 540 F.2d 53, 56 (2d Cir.1976). As the cited case holds, that is all that the law requires.

#### (c) *Personal Items*

 Plaintiff also compiled a list in Lisbon in October, 1981 of personal items which were lost on the CAMERA. PX 8. He assigned values in Finnish marks to those items. They total FMK 38,750. LaMarque assigned a value of $8,959 to these items. He did so by the simple expedient of converting Granholm's Finnish valuations into United States currency. LaMarque candidly disclaimed any expertise in valuation of any of these personal items. In that regard, his status is different from the navigation and electronic equipment items appearing on PX 7. Under this heading of the claim, LaMarque's testimony has no probative value whatsoever.

But it does not follow that the claim is not sufficiently proven. In *Caten, supra,* the Second Circuit extended the rule permitting valuation testimony from an owner of personal property to "an owner of household goods and personal effects," *id.* at 433. I accept Granholm's testimony pursuant to that rule.

Defendants argue strenuously that Granholm's testimony on these points is unworthy of belief. Emphasis is laid upon his failure to produce any invoices, cancelled checks, or other documents evidencing cost of the items on both lists. That is perhaps surprising in respect of certain items; much less so as to others. It is basically a question of credibility. Defendants ask me to conclude that Granholm either lied about the presence on board the CAMERA of certain listed items, or lied about the value of items that were in fact on board. Having observed plaintiff on the stand, I consider his testimony to be worthy of belief on these points. There is nothing inherently incredible about the presence of the equipment claimed to be on board the CAMERA, both navigational and personal. No exotic items of startling value are included. Defendants offered no persuasive evidence attacking the valuations claimed.[8]

The allowances for the basic hull ($93,700), extra equipment ($46,699), and personal items ($8,959) total $149,358, which are sufficiently proved.

---

8. One of the few items subjected to cross examination was a "sextant, metal" listed on PX 7 with a value of FMK 3000. LaMarque calculated the dollar loss at $693.64, derived from the 4.325 exchange rate. He testified that he assumed the sextant was a Plaith, an expensive German sextant, and acknowledged that metal sextants could be bought for less. LaMarque had no personal knowledge of what kind of sextant Granholm had purchased. But Granholm knew, and counsel did not ask him.

I disallow one significant item. LaMarque arrived at a total of $201,439 for the value of the CAMERA and all equipment on board. As noted, the three allowed items total only $149,358. The difference is made up of an item in excess of $52,000 (LaMarque's actual figure is $52,023.12, Tr. 99) which is said to be the value of work designing and installing the CAMERA's additional navigation and electronic equipment. LaMarque included this figure in his calculation of the total loss. Tr. 99.

The only evidence in support of this item is from Granholm. He testified that when the CAMERA was being constructed in Finland, an engineer named Riago Vuorio was responsible for the design and installation of the extra electronics. Vuorio had his own engineering company in Helsinki; but notwithstanding those responsibilities, Granholm testified, Vuorio worked for a year at the CAMERA project, "doing nothing but designing and installing these electronics."

The record is devoid of any evidence concerning this engineer's compensation, if any, for his year-long efforts. If Granholm paid Vuorio for his labors, I do not know what the amount was. For all that the proof discloses, Vuorio was an ocean sailing buff who contributed his time, out of sheer enjoyment or because he viewed the CAMERA as a floating advertisement for his company's skills. These motives may strike one as unlikely, but they are not fanciful. The difficulty is that there is no proof one way or the other on the point.

Plaintiff attempted to establish the value of engineer Vuorio's services by eliciting an opinion from LaMarque. LaMarque testified on direct examination:

Q. We heard from Mr. Granholm that the man who installed that equipment, specially fitted the yacht for the equipment, spent a year on this project and did nothing else; that the equipment was installed in such a way as to prohibit, if that's possible, damage to this equipment by sea water.

Assuming that this man did spend a year on that job, do you, sir, have an opinion as to the reasonable value of the work which he did in installing that equipment?

A. Well, that came up to a figure of $52,023.12.

Q. The figure which you gave us of some $201,000 includes all of the items, is that correct?

A. That is correct, sir.

THE COURT: That last figure is $52,023.12?

THE WITNESS: That is correct, your Honor.

THE COURT: That is what again, sir?

THE WITNESS: That was the item for special design and installation of electrics and electronics. Tr. 98–99.

LaMarque cheerfully conceded on cross-examination that he had no expertise whatsoever "on what people are paid in Finland for doing work of the sort that was necessary here." Tr. 99. He was similarly ignorant of the cost of such services in any area of the world other than New York. *Ibid.* His valuation figure in excess of $52,000 for these services must accordingly be understood as based upon New York costs.

I cannot accept that valuation as probative. Damages in collision cases are governed by the maxim *restitutio in integrum*. On that principle, "value is the measure of compensation in case of total loss." *Standard Oil Company of New Jersey v. Southern Pacific Company*, 268 U.S. 146, 158, 45 S.Ct. 465, 467, 69 L.Ed. 890 (1925). "The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." *Id.* at 156, 45 S.Ct. at 467. The value of a lost vessel may be proved, *inter alia*, by contemporaneous sales of comparable vessels, or by the cost of reproduction as of the date of the valuation. *Id.* at 155–56, 45 S.Ct. at 466–67. "Ordinarily, contemporaneous cost of construction would be a good indication of the amount of damages resulting from the loss of a new ship. There ought not to be any difference between

reasonable original cost and estimated cost of reproduction as of the date when built." *Id.* at 158, 45 S.Ct. at 467. That rule applies here. The CAMERA was less than one year old when the collision occurred. "A proper consideration of all relevant facts" points to Finland as the logical situs for calculation of reproduction cost. Plaintiff is Finnish. The CAMERA's stock design is that of a Finnish company, OY Avance Yachts AB. of Larsmo. She was built in Finland. Vuorio, a Finnish engineer, rendered his services in Finland. I have no doubt that his services were valuable. But plaintiff's burden is to furnish "reasonable data from which the amount of damages can be ascertained with reasonable certainty," *Compania Pelineon de Navegacion, supra.* In this case plaintiff should have proved the "contemporaneous cost" of this aspect of the CAMERA's construction by proving what he paid for Vuorio's services *in Finland.* If for some reason money did not change hands, evidence of the value of such services *in Finland* should have been adduced. I cannot assume that LaMarque's New York cost estimate reflects Finnish cost. That would have been sheer speculation. There is a failure of proof on this item. No doubt the engineering services were valuable. But the proof does not permit me to quantify that value. In consequence it is not compensable.

Plaintiff's property damage claim is allowed in the amount of $149,358.

*Plaintiff's Claim for Personal Injuries*

■ Plaintiff claims damages for past and future pain and suffering as the result of injuries caused by the collision. The claim is supported by the testimony of an orthopedist, Dr. Arthur Friedman. Dr. Friedman examined Granholm for the first time on July 27, 1981 in New York after Granholm arrived from Venezuela. Granholm had not sought medical assistance on board the CYS BRILLIANCE or in Venezuela. He was recommended to Dr. Friedman by the attorney he had retained. At this examination plaintiff complained of pain and stiffness in the cervical spine area, and head pain. The pain radiated into both shoulders and upper arms, and was aggravated by movements. X-rays of the cervical spine and shoulders were unremarkable. Dr. Friedman made positive findings of spasm, tenderness, and restriction of movement in the upper back and shoulder area. He diagnosed a cerebral concussion and acute muscular sprain and derangement of the cervical spine. Friedman recommended that Granholm wear a surgical collar, apply moist heat to the affected areas, and take a muscle relaxant medication.

Dr. Friedman examined plaintiff a second time on May 10, 1982. Granholm complained of continuing pain and stiffness which had restricted his strenuous sports activities. Dr. Friedman testified that this examination revealed persistent tenderness, with some residual spasm and restriction of movement.

At a third examination on September 19, 1983, the day before Dr. Friedman testified, Granholm made similar complaints and Dr. Friedman reached a comparable conclusion. He testified that his continued objective findings of tenderness and spasm indicated a permanent injury.

It is common ground that Granholm followed none of the recommendations which Friedman testified he gave to Granholm at the first examination. Granholm had not consulted a physician for this condition for the two years prior to trial. He testified that he still had some pain. He has missed only two or three days' work during the interim. Granholm testified that he has had to give up playing tennis. He is planning, however, to participate in an upcoming single handed transatlantic sailing race.

Defendant called a medical witness, Dr. Sidney A. Bernstein. Dr. Bernstein examined Granholm at defendant's request on May 10, 1982. Dr. Bernstein took x-rays of the cervical spine. They showed no pathology, evidence of trauma or arthritic changes. Dr. Bernstein testified that he could make no objective findings of joint or muscle pathology. In his view, Granholm had made a complete recovery from what-

ever injury he had received. Dr. Bernstein found support for that conclusion in Granholm's failure to seek other medical advice or treatment after the trauma, together with Granholm's failure to follow the recommendations of Dr. Friedman. That course of conduct indicated to Dr. Bernstein that plaintiff's pain was "not bad enough to worry about."

The totality of the evidence leads me to accept Dr. Bernstein's view. I find on this evidence that plaintiff struck his head and neck when the impact of collision knocked him from his bunk. This resulted in a soft tissue injury causing discomfort which was still significant when Dr. Friedman first examined plaintiff on July 27, 1981, sixteen days after the collision. Granholm is entitled to be compensated for this past pain and suffering. But plaintiff has failed to prove by a fair preponderance of the credible evidence that he continues to suffer compensable pain and suffering from this injury, or that he will do so in future.

I make an award to plaintiff for past pain and suffering in the amount of $5,000.

*Plaintiff's Claim for Transportation Costs From Venezuela to New York*

▬ After the CYS BRILLIANCE deposited Granholm in Venezuela, he incurred the expense of $952.60 for airfare back to New York. That is an expense proximately caused by the collision and I allow it.

*Summary of Damages*

In view of the foregoing, I allow plaintiff's claim for damages as follows:

| | |
|---|---|
| Lost Property: | $149,358.00 |
| Personal Injury: | 5,000.00 |
| Travel Expense: | 952.60 |
| Total: | $155,310.60 |

Under the Court's resolution of the liability question, plaintiff will recover judgment for one-half of this amount, $77,655.30, against the vessel TFL EXPRESS *in rem* and defendant Timur Carriers (Pte.) Ltd. *in personam.* The complaint against defendant Trans Freight Lines, Inc. will be dismissed.

CONCLUSION

The Clerk of the Court is directed to enter judgment in favor of plaintiff Kai Granholm and against the vessel TFL EXPRESS and defendant Timur Carriers (Pte.) Ltd., jointly and severally, in the amount of $77,655.30, with interest from the date of judgment until paid.

The Clerk is further directed to dismiss the complaint against defendant Trans Freight Lines, Inc. with prejudice.

Plaintiff may recover the costs of the action in an amount to be taxed by the Clerk.

It is So Ordered.

On Motion To Reopen Case and to Amend Judgment

On December 13, 1983, this Court filed its Memorandum Opinion and Order holding both colliding vessels in fault, fixing plaintiff's damages in the amount of $77,655.30, and directing the entry of judgment in that amount with interest from the date of judgment. Familiarity with that opinion and order is assumed.

Plaintiff now moves to reopen the case to permit further proof on the point of damages. While not cited in plaintiff's papers, this motion lies under Rule 59(a), F.R. Civ.P. Plaintiff also moves to amend the judgment pursuant to Rule 52(b) so as to allow him prejudgment interest. Defendant opposes both branches of the motion.

▬ The motion under Rule 59(a) to reopen the case is denied. I do so in what I conceive to be a sound exercise of judicial discretion. The holding at issue rejected a particular item of plaintiff's damage claim for insufficiency of proof. Slip op. at 41–44. If my disallowance of that claim was erroneous, plaintiff may appeal from it. But if, as I have concluded, the item was insufficiently proved, no reason appears or is suggested why the requisite proof was not offered at trial. Generally it is required of a litigant seeking to reopen the proof that he proffer evidence "which was not available, or by the use of reasonable

diligence could have been available, for use at the original trial." *Mayer v. Higgins*, 208 F.2d 781, 783 (2d Cir.1953). The policy reason for the rule is apparent. Litigation would be intolerably drawn out if parties failing to offer evidence readily available to them were permitted to reopen the proof if disappointed in the result. Evidence of the cost of electronic design and installation in Finland, which I have held was necessary to establish this particular aspect of plaintiff's claim, was certainly available to him at the time of trial.

■ This brings me to the question of prejudgment interest. Awarding of prejudgment interest in admiralty rests in the trial court's discretion. *Independent Bulk Transport, Inc. v. Vessel "Morania Abaco"*, 676 F.2d 23, 25 (2d Cir.1982). However, prejudgment interest "should be granted in the absence of exceptional circumstances." *Mitsui & Co., Ltd. v. American Export Lines*, 636 F.2d 807, 823 (2d Cir.1981). *Independent Bulk Transport* cites *Mitsui* for the proposition that "it is an abuse of discretion to deny prejudgment interest in admiralty cases except under extraordinary circumstances." 676 F.2d at 25.

■ Defendant in the case at bar argues for denial of prejudgment interest on the authority of *Afran Transport Co. v. The Bergechief*, 285 F.2d 119 (2d Cir.1960). Two vessels collided. Each was at fault. Damages were divided equally under the collision liability law then prevailing; proportional fault under *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397 (1975) had not yet come to pass. One shipowner was owed a balance of $69,203 in damages measured by repair costs. The district court denied prejudgment interest on that balance. The Second Circuit affirmed. Its opinion at 285 F.2d 120 may be read as holding that in a mutual fault collision case, "normally the award of interest may await the court's judgment which fixes the amount due," although adding the *caveat:*

> "But we would not exclude all discretion in the mutual fault collision case; thus if one vessel is grossly at fault the award

of interest to the other may ameliorate somewhat the harsh American rule that division of damages must be equal without reference to the degree of fault. Here under the circumstances shown in our opinion in Afran Transport Co. v. The Bergechief, supra, 2 Cir., 274 F.2d 469, we think denial of pre-decree interest was right." *Ibid.*

But the case at bar, while resulting from mutual fault, caused damage only to plaintiff. In consequence, *Ore Carriers of Liberia, Inc. v. Navigen Company*, 305 F.Supp. 895 (S.D.N.Y.1969), *aff'd*, 435 F.2d 549 (2d Cir.1970), furnishes the closer analogy. The owner of a chartered vessel suffered damages when the vessel attempted to navigate a river without tug assistance. The charterer had breached its warranties of safe port and berth, but the shipowner was at fault in permitting the vessel to proceed with knowledge of the unavailability of tugs. Plaintiff shipowner recovered judgment for half its damages. The question of prejudgment interest was then litigated. Judge Metzner awarded interest, writing at 305 F.Supp. 897:

> "Defendants argue that this case is a mutual fault case and therefore the exception to the normal admiralty rule is applicable. The misconception here, however, flows from categorizing this case on the basis of the court's finding of mutual fault. Defendants overlook the controlling factor calling the exception into play, namely, a collision between two vessels with cross-claims between the respective owners of the vessels. Here one party paid all the damages and the question for the court was whether the other party was liable for all or part of this damage. The situation is precisely analogous to the situation in The Hannah A. Lennen, 77 F.Supp. 471 (D.Del.1948), a mutual fault collision case in which only one party claimed damages. There the court distinguished *The Wright* as follows:
>
>> 'Where only one libel is filed the only uncertainties are those accompanying every admiralty action and every action sounding in tort, viz., the uncer-

tainty of proving liability and the amount of damages. In such cases there is no uncertainty as to the party who should pay all or a portion of the damages if liability can be proven. If interest could not be allowed until the damages are liquidated and the responsibility fixed, it is difficult to see in what admiralty cases of collision interest could ever be discretionary or allowed from a date preceding the decree fixing liability, and the general rule regarding interest in admiralty proceedings would have no force.' Id. at 472."

The Second Circuit, affirming, expressed its agreement that:

"... where the only question is whether one party who has paid all damages is entitled to reimbursement, an award of pre-judgment interest is appropriate." 435 F.2d at 551.

These principles squarely apply to the case at bar.

In *Ore Carriers* the damages were liquidated on the basis of repair costs. In the case at bar plaintiff claims for a total loss of his property. Repairs have not been made, and out-of-pocket expenses never incurred. But the law of this circuit permits admiralty prejudgment interest on damages measured by cost estimates where no money has been expended. *In re Hibbard,* 27 F.2d 686, 687 (L. Hand, Ct.J.); *Independent Bulk Transport Inc., supra,* at 26. See also *Inland Tugs Co. v. Ohio River Co.,* 709 F.2d 1065, 1074–75 (6th Cir.1983) (prejudgment interest awarded on fair market value of plaintiff's sunken vessel).

In the exercise of my discretion, I award plaintiff Granholm prejudgment interest from July 14, 1981, the date he abandoned his yacht. The interest applies to all items of claim except that for plaintiff's personal injuries.[1] The parties do not address the rate of interest in their briefs. While I have discretion there as well, the rate should be measured "by interest on short-term, risk-free obligations" during the pertinent period. *Independent Bulk Transport, Inc., supra,* at 27. The parties are directed to agree on a rate if they can, without prejudice to defendant's right to challenge the award in principle on appeal if so advised. They may consult money market rates or Treasury bill rates. Failing agreement, the settlement of counter-amended judgments with supporting affidavits and briefs will be necessary.

Settle amended judgment in accordance with this opinion.

---

1. I have considered and reject defendant's argument that prejudgment interest should be denied because plaintiff grossly exaggerated his personal injury claim. Where a property loss claim is grossly exaggerated, the trial court may in its discretion penalize the claimant for bad faith by denying prejudgment interest. See, e.g., *Matter of Bankers Trust Co.,* 658 F.2d 103, 108–10 (3d Cir.1981). But property cost estimates are subject to more objective criteria than claims for past and future pain and suffering, which underlay the present plaintiff's effort to recover for personal injuries. It is true that on the preponderance of the medical evidence, I rejected plaintiff's personal injury claim for the most part. But plaintiff was in a position to call a qualified medical expert who testified in support of the claim. There is no basis for suggesting that the property damage claims were grossly exaggerated. Prejudgment interest is awarded only with respect to the property claims. In these circumstances, I am not prepared to deny plaintiff prejudgment interest on the property claims because his claim for personal injury did not for the most part succeed.